# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

==============
## NO. 03-00-00257-CV
==============

**TCA Building Company, Appellant**

**v.**

**Entech, Inc.; C. G. Embry; and Northwestern Resources Company, Appellees**

========================================================================
### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT
### NO. 95-11006, HONORABLE F. SCOTT MCCOWN, JUDGE PRESIDING
========================================================================

TCA Building Company (TCA) appeals from a take-nothing summary judgment recovered by Entech, Inc., C. G. Embry, and Northwestern Resources Company on causes of action brought against them by TCA.[1] For convenience, we will refer to the appellee-defendants collectively as "Northwestern" save as it may be necessary to name one of them particularly. We will affirm the judgment below.

---

[1] In its live petition, TCA alleged that Entech, Inc. "is a Montana Delaware [sic] corporation," that Northwestern Resources Company "is a Montana Corporation," and that C. G. Embry "is a resident of Fairfield, Freestone County, Texas." It is not contended that C. G. Embry is a different person from Carroll Embry, who signed two instruments, material in this appeal, as "Vice President/General Manager" of Northwestern Resources Company.

**THE CONTROVERSY**

Pursuant to two 1978 coal leases and a permit issued by the Texas Railroad Commission, Northwestern conducts a lignite-mining operation known as the Jewett Mine. Northwestern sells the lignite to Houston Lighting and Power Company (HL&P) under a contract that designates Northwestern as HL&P's exclusive supplier of lignite for a nearby power plant in Freestone County.

TCA purchased in 1991 the fee-simple estate in a 107-acre tract of land lying within and surrounded entirely by the Jewett Mine, taking title subject to Northwestern's 1978 coal leases. Some two months after acquiring its 107 acres, TCA ordered Northwestern from the tract because TCA had concluded that Northwestern's two 1978 leases were void. Holding a contrary view, Northwestern continued to prepare the 107-acre tract for mining by removing the topsoil and some sixty feet of additional overburden (earth and rock) to gain access to the lignite.

To TCA's threat of a lawsuit for large damages, Northwestern responded that it would bypass and not mine TCA's 107 acres if TCA refused to acknowledge Northwestern's right to mine them under its 1978 leases. TCA refused. Northwestern bypassed the 107 acres. TCA sued Northwestern in Freestone County district court for declaratory relief holding invalid and setting aside Northwestern's 1978 leases, damages for real-estate fraud, and injunctive relief.

Before trial, Northwestern gratuitously executed and recorded in the deed records on December 10, 1993, a document headed "Release of Exclusivity and License." The document provides as follows:

As permitted by [its 1978 leases], Northwestern has determined not to mine lignite from the [107 acres], but in conformity with requirements of law and applicable regulation, Northwestern will conduct reclamation operations on the Property. In order to afford TCA access to the Property and the opportunity to conduct mining operations through its own contractors or lessees exclusivity of its rights and estate under the [1978 leases] and to grant a license to TCA, its successors and assigns, upon the stated terms and conditions.

\* \* \*

Northwestern hereby releases the exclusivity of its rights and estate under the [1978 leases] so that TCA, its successors and assigns, shall have a right, subject to applicable law and regulation, to mine, market and sell coal from the Property without limiting the right of Northwestern to continue and complete its reclamation and incidental operations on the Property pursuant to its rights under the [1978 leases].

Northwestern grants to TCA, its successors and assigns, a license for ingress and egress through the Jewett Mine to the Property for the purpose of exercising the rights herein released to TCA, its successors and assigns. . . . The license herein granted shall be irrevocable until such time as there shall be other reasonable access available to a public road that does not require passing over land under the control or in the possession of Northwestern.

\* \* \*

TCA, its successors and assigns, shall be solely responsible for their compliance with all applicable law and regulation and shall conduct any operations on the Property . . . in a manner that does not cause Northwestern to be in violation of any applicable law, regulation, regulatory permit condition or regulatory order.

\* \* \*

In the course of the Freestone County litigation, Northwestern also gratuitously executed and recorded in February 1994 a document headed "Supplement to Release of Exclusivity and License." The document provided as follows:

Some questions have arisen regarding the intent of Northwestern Resources Co. . . . in filing the Release of Exclusivity and License. . . .

3

This Supplement . . . is filed to clarify and resolve any questions of intent regarding the purpose and effect of the Release of Exclusivity and License.

\* \* \*

Northwestern hereby grants, sells, and conveys all right, title, and interest in and to the coal and lignite on and under the property . . . to TCA. Additionally, Northwestern hereby releases any and all right, title, and interest to the coal and lignite under the Property which it claimed under the Coal Leases, Options and Ratification. Northwestern wants no money for the sale of any coal or lignite produced from the Property, by TCA or its assigns.

\* \* \*

Northwestern expressly grants TCA the right to sell coal and lignite from the Property to Houston Lighting & Power. To assist TCA in this [regard], Northwestern waives its right under the Lignite Supply Agreement with [HL&P] to be the exclusive supplier of lignite to Houston Lighting & Power. This waiver is given to help settle the dispute that has arisen between TCA and Northwestern [and] is not a general waiver of any provision of the Lignite Supply Agreement, other than Northwestern's exclusive supplier rights, and then only to TCA and its assigns.

Northwestern acknowledges that it is now obligated to reclaim the TCA Property. Northwestern does not release the Coal Leases, Options or Ratifications because it has a continuing obligation to reclaim the Property pursuant to both the Coal Leases and applicable law.

Northwestern agrees to any delivery schedule mutually acceptable to Houston Lighting & Power and TCA.

Following a jury trial, the Freestone County district court rendered judgment that TCA take nothing by its claims. TCA appealed from the judgment. While the appeal was pending, Northwestern notified TCA that it intended to replace the overburden it had taken previously from the 107-acre tract. This was necessary, according to Northwestern, to comply with regulatory requirements of the Texas Railroad Commission. TCA applied to the Freestone County district court for a temporary injunction restraining Northwestern from replacing the overburden until a final

determination of TCA's appeal. The trial court declined to issue the requested injunction and TCA appealed from that order.

Because TCA failed to establish that it lacked an adequate remedy at law, the appellate court affirmed the district-court order refusing to issue the temporary injunction. *See TCA Building Co. v. Northwestern Res. Co.*, 890 S.W.2d 175, 179 (Tex. App.—Waco 1994, no writ). Northwestern thereafter replaced the overburden on TCA's 107-acre tract.

TCA initiated the present litigation in a Travis County district court in August 1995, claiming a right to damages based upon Northwestern's alleged breach of contract, fraud, trespass, and interference with a contract. While the present cause was pending in Travis County, the appellate court affirmed on its merits the judgment of the Freestone County district court that TCA take nothing by its claims for declaratory relief holding invalid Northwestern's 1978 leases, damages, and injunctive relief. *See TCA Building Co. v. Northwestern Res. Co.*, 922 S.W.2d 629 (Tex. App.—Waco 1996, writ denied).[2]

Northwestern moved for summary judgment in the Travis County lawsuit. We now review the trial court's summary judgment that TCA take nothing by its claims for breach of contract, fraud, trespass, and tortious interference. The judgment also denies TCA's competing motion for summary judgment. TCA contends generally that the trial court erred in both respects. We review the record and determine anew all issues raised by the grounds asserted in the respective motions for

---

[2] TCA was also unsuccessful in federal-court suits against Northwestern founded upon alleged anti-trust violations. *See TCA Building Co. v. Northwestern Res. Co.*, 73 F. Supp. 29 (S.D. Tex. 1995); *TCA Building Co. v. Northwestern Res. Co.*, 861 F. Supp. 1366 (S.D. Tex. 1994).

summary judgment. *See Hanson v. Republic Ins. Co.*, 5 S.W.3d 324, 327 (Tex. App.—Houston [1st Dist.] 1999, pet. denied).

## BREACH OF CONTRACT

The contract made the basis of TCA's breach-of-contract claim allegedly arose from the Release of Exclusivity and License and the Supplement to Release of Exclusivity and License. We have heretofore set out at length the terms of the two instruments. For convenience hereafter, we will refer to them simply as the "Release" and the "Supplement." Northwestern's obligations arising from these two instruments were augmented, according to TCA, by certain statements made by Mr. Embry in his testimony during the trial on the merits in Freestone County.[3]

If we understand correctly TCA's live petition, it alleges the Release and Supplement amounted to *contractual promises* allegedly breached by Northwestern. These promises reduce mainly to the breach of a single obligation: an alleged contractual undertaking by Northwestern to allow TCA a reasonable amount of time (and thus an opportunity to mine and sell the lignite) before Northwestern replaced the overburden on the 107-acre tract. The sole issue on appeal, according to TCA, is whether the trial court erroneously construed the Release and Supplement when the court refused to impute such an implied promise to those instruments. TCA contended for that implied

---

[3] Referring to TCA's rights under the Release and Supplement, Mr. Embry testified as follows: (a) Northwestern was willing that TCA mine the coal if TCA thought it was worth $50,000,000; (b) he could see no reason why TCA could not mine the coal if it obtained the necessary permits from the Texas Railroad Commission; (c) Northwestern would not seek compensation from TCA for removing the overburden from the 107 acres, but "just step out of the way" and "cooperate with" TCA's efforts to remove the lignite; and (d) Northwestern would stockpile overburden material adjacent to the 107-acre tract to facilitate TCA's replacement of the overburden.

6

promise in its motion for partial summary judgment.[4]  By replacing the overburden prematurely, according to TCA, Northwestern made it impossible for TCA to mine the lignite profitably and foreclosed TCA's opportunity to realize an expected profit of $36,000,000 from selling the lignite to HL&P.

Northwestern moved for summary judgment on the ground that the Release and Supplement were given without consideration, precluding any contractual obligations on its part, whether express or implied.  It appears undisputed that TCA itself gave no promise or other consideration in exchange for the Release and Supplement.  It is not necessary, however, that an offeree itself furnish the consideration; it may be given by another person.  *See* Restatement (Second) of Contracts § 71(4) (1981).  It *is* essential, however, that the consideration be bargained for.  *Id.* § 71(1).  "A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee [or another] in exchange for that promise."  *Id.* § 71(2) (emphasis added); *see also id.* § 71(4).

TCA argues that Northwestern received consideration in the form of tactical advantages it gained in the Freestone County trial by reason of the Release and Supplement.  For

---

[4] TCA contends the trial court was required by the following rules of construction to impute such a promise to the Release and Supplement:  In arriving at the intent of a grantor, a court must construe the express language of a conveyance strictly against the grantor, including the text of any reservation contained in the instrument, and harmonize its parts where necessary to effectuate the purpose of the grant and to transfer to the grantee the largest estate that is consistent with the language employed.  *See Balandran v. Safeco Ins. Co.*, 972 S.W.2d 738, 741 (Tex. 1998); *Dallas Power & Light Co. v. Cleghorn*, 623 S.W.2d 310, 310-12 (Tex. 1981); *Terrell v. Graham*, 576 S.W.2d 610, 612 (Tex. 1979); *Rio Bravo Oil Co. v. Weed*, 50 S.W.2d 1080, 1087 (Tex. 1932); *Cartwright v. Trueblood*, 39 S.W. 930, 931 (Tex. 1897); *Curdy v. Stafford*, 30 S.W. 551, 552 (Tex. 1895).

example, TCA contends the purpose of the two instruments was "to negate TCA's claim" in that lawsuit "that Northwestern was holding the [107-acre tract] hostage to the Jewett Mine— threatening to mine around and bury the coal unless TCA executed ratifications of [Northwestern's 1978] Coal Leases." And Northwestern was able to argue at trial that the Release and Supplement embodied a settlement and compromise of TCA's claims. Whether these assertions are true is immaterial. Nothing in the record suggests that such tactical advantages were either promised or given by anyone *in exchange* for any obligations undertaken by Northwestern in the Release and Supplement. Moreover, we believe TCA's argument misconceives the nature of the Release and Supplement, which Northwestern voluntarily and gratuitously executed and recorded. The Release and Supplement amounted to Northwestern's *non-promissory offer* of the legal rights transferred to TCA in the two instruments, whether or not the offer included as an incident an implied promise to forbear from replacing the overburden for a reasonable period of time. *See id.* § 55. Northwestern's performance of any resulting contract would have been "complete at the moment of acceptance" by TCA. *Id.* cmt. b.

Converting Northwestern's non-promissory offer into a contract required that TCA accept the offer by some manifestation of assent to the terms of the Release and Supplement. *See id.* §§ 3, 9, 17, 23, 35(1), 50(1), 55 cmt. b. For the reasons discussed below in connection with the legal effect of the Release and Supplement as a recorded conveyance, TCA did not accept the Northwestern offer (thereby creating a contract with Northwestern) because TCA manifested as a matter of law an intention *not* to accept the terms of the two instruments.

8

In support of its breach-of-contract theory, TCA relies upon judicial decisions involving the proper construction of conveyances.[5] We will therefore address the legal effect of the Release and Supplement as a conveyance.

The Release and Supplement together purport to convey an interest in real property according to the terms stated therein. Northwestern executed and delivered the two instruments without requiring consideration in exchange. In addition, however, Northwestern itself recorded the instruments in the deed records of Freestone County. This act gave rise to a presumption that Northwestern (even though it received no consideration) "did so for the purpose of giving effect to [each] instrument as a conveyance." *Ford v. Hackel*, 77 S.W.2d 1043, 1044 (Tex. 1935). The presumption was rebuttable, however, by a showing that TCA, the grantee named in the instruments, rejected the conveyance. *Id.* at 1045.

The validity of the Release and Supplement as a conveyance, and the authority granted therein to TCA, derived from and depended upon the continued existence and validity of Northwestern's leasehold estate under its 1978 coal leases. After Northwestern recorded the Release and Supplement, TCA obviously assailed its own powers and rights thereunder by continuing to prosecute its cause of action for declaratory judgment that Northwestern's leasehold under the 1978 leases was "void ab initio." TCA continued to press this contention until the matter was finally decided adversely to TCA's claim on appeal, almost two years after the Release and Supplement were recorded. *See TCA Building Co. v. Northwestern Res. Co.*, 922 S.W.2d at 33-36. We hold as a matter of law that TCA's conduct in this regard amounts to a rejection of the conveyance embodied

---

[5] *See* note 4, *supra.*

9

in the Release and Supplement. *See* Restatement (Second) of Contracts § 38 cmt. b (1981). (offeree's power of acceptance terminated by words or conduct justifying inference that offeree intends not to accept offer).

For the reasons stated above, we hold the Release and Supplement did not give rise to a contractual or binding relationship between TCA and Northwestern. Consequently, there exists no contract to which one may impute the necessarily implied promise for which TCA contends. The trial count did not err in its order that TCA take nothing by its breach-of-contract claim. And, as discussed hereafter, our holding in this regard is also dispositive of TCA's remaining claims.

**FRAUD**

In its live petition, TCA alleged a cause of action for common-law fraud and a statutory cause of action for fraud involving a real-estate transaction. *See* Tex. Bus. & Com. Code Ann. § 27.01 (West 1991). If we understand correctly TCA's allegations, as amplified in its brief on appeal, TCA alleged fraud in the following three particulars:

1. The trial court erroneously construed the Release and Supplement as not containing an implied promise by Northwestern to delay for a reasonable period of time before replacing the overburden on TCA's 107-acre tract; and the court rejected TCA's fraud claim based upon this erroneous construction. Under a correct interpretation of the Release and Supplement, those documents imply such an obligation on Northwestern's part, and TCA is entitled to a jury trial on the issue of whether Northwestern made that implied promise with an intention not to keep it.

2. If, however, the trial court correctly construed the Release and Supplement, then the Release and Supplement themselves amounted to fraudulent representations made "to escape

10

liability in the Freestone County [t]rial" and TCA is entitled to a jury trial "on the issue of whether [Northwestern] fraudulently used the Release and Supplement . . . to avoid liability in the Freestone County trial and defraud TCA."

3. After the Freestone county trial on the merits, Mr. Embry threatened to replace the overburden "unless TCA immediately agreed to assume [Northwestern's] retained obligation to reclaim," that is to say, Northwestern's regulatory obligation to replace the overburden on TCA's 107-acre tract. According to TCA, this threat demonstrates Northwestern's intent, at the time it recorded the Release and Supplement, not to perform its obligation to furnish the materials necessary for replacing the overburden. So much is implied by the post-trial threat because Mr. Embry knew at the time he made the threat that TCA did not have the necessary replacement material, Northwestern having used the material for reclamation elsewhere in the Jewett Mine.

Northwestern moved for summary judgment against TCA's fraud claims on the ground that TCA could not reasonably have relied upon any alleged misrepresentations in the Release and Supplement or Mr. Embry's testimony in the Freestone County trial. The trial court sustained this part of Northwestern's motion and ordered that TCA take nothing by its fraud claims.

An essential element of a common-law fraud action is a plaintiff's reasonable or justifiable reliance upon the defendant's alleged misrepresentation, which reliance induced action or inaction on the plaintiff's part and caused him pecuniary loss. *See Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001); *Formosa Plastics Corp. v. Presidio Eng'rs and Contractors, Inc.*, 960 S.W.2d 41, 47-48 (Tex. 1997); Restatement (Second) of Torts, § 537 (1977). Proof of such reliance is also necessary to sustain a fraud action under the Texas Business and

11

Commerce Code. *See* Tex. Bus. & Com. Code Ann. § 27.01(a)(1)(B) (West 1991); *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 182 (Tex. 1997). The non-existence of any of the requisite elements of a fraud action, whether as a matter of law or fact, is fatal to the claim. *See Stone v. Lawyers Title Ins. Co.*, 554 S.W.2d 183, 185 (Tex. 1977).

We conclude as a matter of law that TCA cannot reasonably or justifiably have relied upon any representations contained in the Release and Supplement or the trial testimony of Mr. Embry, that TCA could not have acted or refrained from acting based on any such representation, and that TCA could not have sustained a pecuniary loss caused by such reliance.

We have held above that TCA rejected the terms and the conveyance embodied in the Release and Supplement. There existed no contract between the parties; the trial judge's construction of the Release and Supplement is immaterial. TCA's rejection of Northwestern's offer is inherently inconsistent with the reliance required for a fraud action. *See Dvorak v. American Fam. Mut. Ins. Co.*, 508 N.W.2d 329, 332 (N.D. 1993) (As a matter of law, no reliance can be founded on alleged misrepresentations contained in offer rejected by offeree.). In the *Swanson* decision mentioned above, the plaintiffs based their fraud claim on an alleged misrepresentation by the defendants that induced plaintiffs to sell their property to defendants at a low price. In the transaction, however, the plaintiffs executed and gave a release disclaiming that they had relied upon any representations made by the defendants. The court held the disclaimer conclusively negated the reliance element necessary to prove the plaintiffs' fraud claim. *See Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d at 177-80. We see no material difference between a disclaimer renouncing a legal right to rely upon a representation and a rejection of the representation in the first instance. In either case, no dependence

12

or confidence is placed upon the representation as a basis for a claim of legal right. As a matter of law, TCA's rejection of the alleged misrepresentations in the Release and Supplement precludes the essential element of reliance.

We hold the trial court did not err in its order that TCA take nothing by its fraud claims.

## TRESPASS

A cause of action seeking damages based on civil trespass requires an unauthorized physical entry upon another's land. *See Cain v. Rust Indus. Cleaning Servs., Inc.*, 969 S.W.2d 464, 470 (Tex. App.—Texarkana 1998, pet. denied); *Ward v. Northeast Tex. Farmers Co-op Elevator*, 909 S.W.2d 143, 150 (Tex. App.—Texarkana 1995, writ denied). TCA alleged Northwestern trespassed upon TCA's 107-acre tract by replacing the overburden and generally using the tract in the course of operating the Jewett Mine, contrary to contractual promises contained in the Release and Supplement, and Mr. Embry's testimony in the Freestone County trial. In its motion for summary judgment, Northwestern contended its actions were legally justified. The trial court sustained the motion and ordered that TCA take nothing by its trespass claim.

Northwestern's entry upon the 107-acre tract was not unauthorized as a matter of law because Northwestern possessed the necessary authority under its 1978 coal leases unless TCA acquired a superior right of possession by reason of the Release and Supplement. TCA took title to the 107-acre tract *subject* to those leases and Northwestern's authority thereunder. The Release and Supplement did not vest a superior right in TCA because, as we have held above, TCA rejected the conveyance embodied in those two instruments.

13

We hold, therefore, that the trial court did not err in ordering that TCA take nothing by its trespass claim.

## TORTIOUS INTERFERENCE WITH CONTRACT

TCA alleged Northwestern tortiously interfered with TCA's contract to sell HL&P any lignite mined from TCA's 107-acre tract. The alleged acts of interference were as follows: Northwestern's failure to provide support and facilities to TCA as promised in the Release and Supplement and Mr. Embry's testimony in the Freestone County trial; Northwestern's replacing the overburden on TCA's tract; and certain statements made by Northwestern representatives at a meeting of bidders seeking to contract with TCA for the work of mining the 107-acre tract. Northwestern moved for summary judgment on the ground that its conduct in each instance was "in the exercise and protection of [Northwestern's] superior rights and obligations." The trial court sustained the motion and ordered that TCA take nothing by its claim.

We conclude as a matter of law that the conduct attributed to Northwestern was not actionable and not the cause of a legal injury to TCA. This necessarily follows from our previous conclusion that TCA acquired no right to mine the lignite on the 107-acre tract that was superior to Northwestern's right to do so. TCA took fee-simple title to the tract subject to Northwestern's 1978 coal leases and rejected Northwestern's conveyance embodied in the Release and Supplement. It is not contended that Northwestern exceeded its rights and powers under the 1978 leases. We hold the acts of interference alleged against Northwestern were therefore within its legal authority and justified as a matter of law. *See Texas Beef Cattle Co. v. Green*, 921 S.W.2d 203, 211 (Tex. 1996).

14

Accordingly, the trial court did not err in ordering that TCA take nothing by its tortious-interference claim.

Finding no reversible error, we affirm the trial court judgment.

_

John E. Powers, Justice

Before Justices Kidd, Yeakel and Powers[*]

Affirmed

Filed:   March 28, 2002

Publish