

# IN THE
# TENTH COURT OF APPEALS

## No. 10-08-00016-CV

**BOMAR OIL & GAS, INC.,**

                                                              **Appellant**

 **v.**

**D. MARK LOYD,**

                                                              **Appellee**

---

**From the 87th District Court**
**Freestone County, Texas**
**Trial Court No. 04-072B**

---

## MEMORANDUM OPINION

---

BoMar Oil & Gas, Inc. operates the Marie C. Dodge Well in which D. Mark Loyd has an unleased mineral interest. Loyd sued BoMar for fraud and violations of the Deceptive Trade Practices Act, alleging that improper expenses were charged against his proportionate share of production. Loyd also sought an accounting. A jury found for Loyd. On appeal, BoMar challenges: (1) the legal and factual sufficiency of the evidence to support the jury's findings on the suit for an accounting, DTPA violations, fraud, and damages; (2) whether a non-producing cotenant is a consumer for purposes

of the DTPA; and (3) whether Loyd is entitled to attorney's fees, exemplary damages, and prejudgment interest. We modify the judgment and affirm the judgment as modified.

## CONSUMER STATUS UNDER THE DTPA

In issue two, BoMar contends that Loyd is not a consumer for DTPA purposes.[1]

"Consumer" means an individual, partnership, corporation, this state, or a subdivision or agency of this state who seeks or acquires by purchase or lease, any goods or services. TEX. BUS. & COM. CODE ANN. § 17.45(4) (Vernon Supp. 2008). "Goods" means tangible chattels or real property purchased or leased for use. *Id*. at § 17.45(1). "Services" means work, labor, or service purchased or leased for use, including services furnished in connection with the sale or repair of goods. *Id*. at § 17.45(2). The goods or services purchased or leased must form the basis of the complaint. *See Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 351-52 (Tex. 1987).

In *Hamilton v. Texas Oil & Gas Corp.*, 648 S.W.2d 316 (Tex. App.—El Paso 1982, no writ), TXO sued two non-operator working interest owners to recover their shares of drilling costs. *See Hamilton*, 648 S.W.2d at 319. The non-operators countersued for damages under the DTPA. *Id*. The jury found that the non-operators were consumers, but the trial court disregarded this finding. *Id*. On appeal, the non-operators argued that TXO rendered services, including "directing and controlling all operations, paying costs, and providing management, bookkeeping and supervision," and was paid for those services. *Id*. at 322. The El Paso Court disagreed:

---

[1] BoMar raised this issue in a motion for directed verdict.

> …TXO was simply reimbursed for costs incurred on behalf of the operating and non-operating interest owners. Appellant did not employ TXO. Rather, there was merely a consolidation of interests. TXO was the "front man" incurring the debts for all, for which it was entitled to be reimbursed. That TXO did not intend to make a profit for what it did is a factor to be weighed. Appellant would contend that pursuant to *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535 (Tex. 1981), even if Appellant had not purchased services from TXO, he purchased from the suppliers of TXO. Although *Cameron* eliminated the privity requirement, and even assuming Appellant was a purchaser in this context, the suppliers did not provide the services which form the basis of the complaint and *Cameron* is not applicable. The purpose of operating agreements, being to spread the risk of drilling operations among several investors with the operator managing the books and making disbursements from a joint account for the benefit of all involved in the J.O.A., should not be construed, we believe, to create liabilities under the Act.

*Id.*; *C & C Partners v. Sun Exploration & Prod. Co.*, 783 S.W.2d 707, 712-13 (Tex. App.—Dallas 1989), *disapproved of on other grounds by Formosa Plastics Corp. United States v. Presidio Eng'rs & Contrs.*, 960 S.W.2d 41 (Tex. 1998); *see Taylor v. GWR Operating Co.*, 820 S.W.2d 908, 910 (Tex. App.—Houston [1st Dist.] 1991, writ denied); *see also Johnston v. Am. Cometra*, 837 S.W.2d 711, 717-18 (Tex. App.—Austin 1992, writ denied).

In *Cox v. Davison*, 397 S.W.2d 200 (Tex. 1965), the Supreme Court explained, "[W]hen mineral property is developed by one cotenant and as a result thereof he acquires minerals which at one time underlay the common property, the problem of accounting to the nonconsenting cotenant arises." *Cox*, 397 S.W.2d at 201-02. The right of one cotenant to appropriate the property of another is sanctioned only because the mineral estate is such that necessarily the rights of one cotenant must be interfered with if another cotenant is to be permitted to exercise those rights properly belonging to him. *Id.* at 203. As between the producing cotenant and the nonjoining cotenant a balance of

equities has been struck. *Id.* The rule of accountability is the proportionate market value of the product less the proportionate necessary and reasonable costs of producing and marketing. *Id.*

When addressing whether nonconsenting cotenants were entitled to interest on the "proportionate part of the money advanced [] to pay for producing and selling the minerals," *Cox* quoted *Shaw & Estes v. Texas Consolidated Oils*, 299 S.W.2d 307 (Tex. Civ. App.—Galveston 1957, writ ref'd n.r.e.):

> With reference to money *necessarily and beneficially spent,* the [Supreme Court] continues: "* * * the principle of contribution has no element of *speculation* in it. In cases of this kind it is implied that the person seeking contribution had authority from his cotenant to expend the money that was actually spent. It is the same as if he had been *actually instructed* by his cotenant to expend that much money for him in improving the lot. This much is implied by law." Because the principle is so well known, it is unnecessary to cite authority for the proposition that a cotenant incurring *speculative* expense in connection with exploration and development of oil, gas, and mineral properties is not entitled to a personal judgment against his cotenant for reimbursement, but only to be reimbursed *out of production* if and when production results.

*Shaw*, 299 S.W.2d at 313 (quoting *Stephenson v. Luttrell*, 179 S.W. 260, 263 (Tex. 1915)); *Cox*, 397 S.W.2d at 201-02.

In light of *Hamilton* and *Cox*, BoMar contends that (1) a non-consenting cotenant has no obligation to pay the costs of development because he is not seeking or acquiring development of the oil or gas; and (2) just as parties to a joint operating agreement are not consumers, neither is a non-consenting cotenant. Loyd maintains that he is a consumer by involuntarily acquiring goods or services. *See Allied Towing Service v. Mitchell*, 833 S.W.2d 577, 582 (Tex. App.—Dallas 1992, no writ) ("A party who

involuntarily acquires services can qualify as a consumer under the DTPA"); *see also D/FW Commercial Roofing Co. v. Mehra*, 854 S.W.2d 182, 187 (Tex. App.—Dallas 1993, no writ) ("It is not necessary that the consumer who 'acquires' the services be the one who sought the services."). Loyd contends that *Cox* "actually implies that an unleased cotenant like Loyd *does* acquire the goods and services that go into production, by recognizing the money paid by the operating cotenant to be 'money *advanced…to pay for produc[tion and marketing costs]*." *See Cox*, 397 S.W.2d at 201; *see also Shaw*, 299 S.W.2d at 313. He contends that *Hamilton* is inapplicable because it is based on the "consensual contractual relationship" between operators and working interest owners.

While an unleased mineral interest owner is not a party to a joint operating agreement, *Hamilton* and *Cox* shed light on whether an unleased mineral interest owner is a consumer. A joint operating agreement "spread[s] the risk of drilling operations" and requires parties to the agreement to reimburse the operator for certain expenses incurred on their behalf. *Hamilton*, 648 S.W.2d at 322. The law similarly requires Loyd, a non-consenting cotenant, to reimburse BoMar for proportionate necessary and reasonable costs of marketing and production. *See Cox*, 397 S.W.2d at 203. Loyd is correct that "[i]t is the same as if [BoMar] had been actually instructed by [Loyd] to expend that much money for him." *Shaw*, 299 S.W.2d at 313. This does not make Loyd a consumer. Like parties to an operating agreement, who are not consumers under the DTPA, Loyd simply reimbursed BoMar for certain costs incurred on his behalf. *See Hamilton*, 648 S.W.2d at 322; *see also Cox*, 397 S.W.2d at 203. We cannot say that Loyd was a consumer for purposes of the DTPA. We sustain issue two and need not address

issues three, four, five, six, seven, or eight addressing the legal and factual sufficiency of the evidence to support Loyd's DTPA claim. *See* TEX. R. APP. P. 47.1.

## LEGAL AND FACTUAL SUFFICIENCY

In several issues, BoMar challenges the legal and factual sufficiency of the evidence to support the jury's findings on Loyd's other claims and award of damages.

Under legal sufficiency review, we ask "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review" and credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex. 2005).

Under factual sufficiency review of issues where the appellant did not bear the burden of proof, we "consider and weigh all of the evidence" and reverse only if the verdict is "so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust." *Checker Bag Co. v. Washington*, 27 S.W.3d 625, 633 (Tex. App.—Waco 2000, pet. denied). On issues where the appellant bears the burden of proof, we reverse only if, "considering all the evidence, the finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust." *Id*.

### Fraud

In issue nine, BoMar challenges the legal and factual sufficiency of the evidence to support Loyd's fraud claim, specifically the elements of reliance and injury.[2]

---

[2]   Fraud by affirmative misrepresentation arises where: (1) a material representation is made; (2) the representation was false; (3) the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker intended that the other party should act upon it; (5) the party relied on the representation; and (6) the party thereby suffered injury. *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 211 n.45 (Tex. 2002). Fraud by nondisclosure arises where: (1) a party

A plaintiff establishes reliance by showing the defendant's acts and representations induced him to either act or refrain from acting, to his detriment. *Marcontell v. Jacoby*, 260 S.W.3d 686, 691 (Tex. App.—Dallas 2008, no pet.). For example, in *TCA Building Co. v. Entech, Inc.*, 86 S.W.3d 667 (Tex. App.—Austin 2002, no pet.), TCA rejected an offer made in a release and supplement, but alleged fraud on the basis of representations made therein. *TCA*, 86 S.W.3d at 674-75. The Austin Court held that rejection of the offer was "inherently inconsistent with the reliance required for a fraud action." *Id*. at 675. A finding of reliance was precluded because "no dependence or confidence is placed upon the representation as a basis for a claim of legal right." *Id*.

Here, after numerous requests from Loyd, BoMar provided information identifying expenses that it claimed were chargeable against Loyd's interest. Upon receipt of this information, Loyd immediately questioned numerous of these expenses and requested additional information. He continued challenging BoMar's information and eventually expressed an unwillingness to pay certain expenses. At trial, Loyd explained why he requested information from BoMar:

> I just need the information that I -- I'm entitled to so I can make a determination as to what's owed me and -- and what -- what the revenue is, what the arrangements are to sell the -- the products, the gas and the oil, and how the facilities are set up so I can determine what's reasonable and not -- not reasonable, what costs are -- what the costs are, first and foremost, and then, second, what are reasonable and necessary costs.

---

conceals or fails to disclose a material fact within the knowledge of that party; (2) the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth; (3) the party intends to induce the other party to take some action by concealing or failing to disclose the fact; and (4) the other party suffers injury as a result of acting without knowledge of the undisclosed fact. *Bradford v. Vento*, 48 S.W.3d 749, 754-55 (Tex. 2001). Reliance is an element of both. *See Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997).

Loyd explained that an accounting would enable him to determine whether costs are reasonable and necessary in order to determine what amount he is owed and whether he was underpaid due to improper charges.

As evidenced by his own testimony, Loyd did not rely on BoMar's representations. At no time before trial did Loyd accept the numbers provided by BoMar or accept payment from BoMar. Rather, he was apparently suspicious of these representations and sought to evaluate the accuracy of BoMar's representations for himself. He never placed any dependence or confidence upon BoMar's representations. *See TCA*, 86 S.W.3d at 675. Although the evidence certainly suggests that BoMar intended that Loyd rely on its representations, we cannot say that the evidence is legally and factually sufficient to show that Loyd actually relied on those representations. We sustain issue nine.

In light of our finding that Loyd cannot prevail on his DTPA and fraud claims, we need not address his tenth issue challenging the legal and factual sufficiency of the evidence to support the jury's award of $73,162 in damages for those claims. *See* Tex. R. App. P. 47.1.[3]

### Accounting

In issue one, BoMar contends that the evidence is legally and factually insufficient to support the jury's finding that $72,162 in unreasonable and unnecessary costs were charged against Loyd's proportionate share of production.

---

[3] The jury awarded $72,162 in damages for Loyd's accounting claim, but also awarded $73,162 for fraud and/or DTPA. The jury charge does not indicate the specific claim on which the award was based. To avoid double recovery, the trial court awarded the $73,162. As previously discussed, Loyd's DTPA and fraud claims fail; thus, he cannot recover the $73,162 in damages.

A cotenant may "extract minerals from common property without first obtaining the consent of his cotenants; however, he must account to them on the basis of the value of any minerals taken, less the *necessary and reasonable costs of production and marketing*." *Byrom v. Pendley*, 717 S.W.2d 602, 605 (Tex. 1986) (emphasis added); *see Cox*, 397 S.W.2d at 201. Loyd testified to several allegedly unnecessary and unreasonable costs deducted from his share of production. BoMar challenges Loyd's evidence regarding overhead, supervision, and engineering fees, the well purchase, testing of the Pettit zone, and a hydraulic fracture treatment performed in the Cotton Valley zone.

**Overhead, Supervision, and Engineering Fees**

Loyd, a petroleum engineer and operator, testified that overhead, supervision, and engineering fees are unrelated to re-entering, producing, or marketing, but are costs assumed by BoMar and its investors. He is not a party to a joint operating agreement and did not agree to share in any of these costs. Moreover, Loyd testified that during several months, BoMar charged the Dodge well $600 a month for overhead, but charged nothing to another well, the Sneed. Relying on BoMar's transaction report, he testified to $3,000 in overhead fees at $600 per month for five months, $17,500 in supervision fees at $700 per day for twenty-five days, and $1,200 in engineering fees.

Loyd's expert witness, Edward Ziegler, testified that overhead represents administrative fees, such as rent, telephones, employees, and costs of running the business, that are chargeable by contract alone. He explained that these fees are listed in an operating agreement. He testified that Loyd was entitled to $14,299 in reimbursement for six and a half years worth of overhead charged since the Dodge

began producing in January 2001. Taking into consideration that some supervision fees might involve work performed on the well, Ziegler testified that Loyd should be reimbursed $7,714 for supervision fees.

BoMar's expert, Don Kirsch, testified that BoMar's overhead fees are consistent with industry practice, per the counsel for petroleum accountants. L.B. Preston, BoMar's president, testified that $600 a month for overhead is reasonable and necessary, describing himself as "cheap" compared to amounts charged by other operators. He admitted sometimes charging the Dodge and not the Sneed, but claimed that the two are unrelated because the Sneed was not a good well, so he stopped charging overhead in order to help investors. Preston further explained that supervision fees involve his being on location each day making decisions and giving instructions. Engineering fees involve evaluating the well bore, checking pressures, helping design fracture treatments, contacting parties, and other engineering-type work.

On appeal, BoMar contends that Loyd's and Ziegler's testimony is conclusory and speculative.[4] Opinion testimony that is conclusory or speculative is not relevant evidence, because it does not tend to make the existence of a material fact "more probable or less probable." *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004). Expert testimony is considered "conclusory or speculative" when it has no factual substantiation in the record. *Beaumont v. Basham*, 205 S.W.3d 608, 621 (Tex. App.—Waco 2006, pet. denied). Loyd and Ziegler both explained why

---

[4]    Loyd complains that BoMar fails to carry its appellate burden by neglecting to point the Court to places in the record showing conclusory or speculative testimony or explain what type of testimony would constitute probative evidence. However, BoMar cites to the record when referring to Loyd's and Ziegler's testimony and contends that the evidence is not supported by any basis or analysis.

overhead, supervision, and engineering fees are not chargeable to an unleased mineral interest owner. *See Beaumont*, 205 S.W.3d at 621. The testimony is neither conclusory nor speculative.

BoMar further contends that overhead constitutes a chargeable production cost:

> In the context of an oil and gas lease, the term "production" has been construed to mean a well which pays a profit, however small, over operating and marketing expenses, even though it may never repay its costs and the enterprise as a whole may prove unprofitable. This definition should apply equally to the phrase "producing in paying quantit[ies]." Operating and marketing expenses include taxes, *overhead charges*, labor, repairs, and depreciation on salvable equipment, but not costs or expenses in connection with the original drilling of the well or reworking expenses. Periodic cash expenditures incurred in the daily operation of a well (sometimes called out-of-pocket lifting expenses) are classified as operating expenses, while one-time investment expenses, such as drilling and equipping costs, are to be treated as capital expenditures. Reworking expenses are part of the capital investment.

*Abraxas Petroleum Corp. v. Hornburg*, 20 S.W.3d 741, 756 (Tex. App.—El Paso 2000, no pet.) (emphasis added) (internal citations omitted); *see United Cent. Oil Corp. v. Helm*, 11 F.2d 760, 762 (5th Cir. 1926) (overhead charges should have been considered as part of the expense of operating the well). BoMar suggests that overhead should likewise be considered a reasonable cost of production when accounting to an unleased mineral interest owner.[5]

---

[5] BoMar also relies on *Wagner & Brown, Ltd. v. Sheppard*, 52 Tex. Sup. Ct. J. 130, 2008 Tex. LEXIS 1000 (Tex. Nov. 21, 2008), in which the Texas Supreme Court evaluated whether Wagner & Brown properly accounted to co-tenant Sheppard for both production and expenses on a unit basis:

> The record reflects that these expenses were for landman fees, lease bonuses, recording fees, and title opinion expenses, part or all of which related to tracts in the unit other than Sheppard's. Additionally, "overhead" expenses (including administration, supervision, office services, and warehousing) were calculated pursuant to a standard accounting agreement relating to the unit. At trial, Sheppard produced no evidence that any of these

Loyd contends that a production-in-paying-quantities analysis should not apply because it does not address allocation of expenses, involves a contractual relationship usually allowing recovery of overhead charges, and focuses on when production increases the lease term and post-completion costs. We disagree. Production of a well involves actually taking oil or gas from the well in a captive state for either storing or marketing the product for sale. *Riley v. Meriwether*, 780 S.W.2d 919, 923 (Tex. App.—El Paso 1989, writ denied). "[T]he terms 'produced' and 'produced in paying quantities' mean substantially the same thing." *Clifton v. Koontz*, 325 S.W.2d 684, 690 (Tex. 1959). *Abraxas*'s definition of "operating and marketing expenses" guides our analysis of which expenses are associated with the actual production from the well.

Citing *Skelly Oil Co. v. Archer*, 356 S.W.2d 774 (Tex. 1961) and *Ladd Petroleum Corp. v. Eagle Oil & Gas Co.*, 695 S.W.2d 99 (Tex. App.—Fort Worth 1985, writ ref'd n.r.e.), Loyd further contends that the *type* of overhead charged by BoMar, *i.e.*, administrative overhead, is unreasonable and unnecessary, even under a production-in-paying-quantities analysis, because it cannot be traced to actual production of the well:

> As to the overhead charges, Mr. Cage in his address concludes that they are more difficult for the lessee to explain than depreciation. He concludes that those items of overhead charges which can be traceable to the actual expense of production of the well's product for marketing

---

expenses were not reasonable and necessary; to the contrary, she stipulated that many of them were.

*Wagner*, 2008 Tex. LEXIS 1000, at *12-13. We do not find *Wagner* persuasive. Unlike Sheppard, Loyd presented evidence that overhead fees are unreasonable and unnecessary and did not stipulate to the contrary. Nor does the record indicate that overhead was calculated per any accounting agreement to which Loyd is a party.

> should be considered in determining whether or not the well is producing in paying quantities.

*Skelly Oil*, 356 S.W.2d at 781-82 (citing Edwin M. Cage, *Production in Paying Quantities: Technical Problems Involved*, 10th ANNUAL INSTITUTE ON OIL AND GAS LAW AND TAXATION 61, 90 et seq. (1959)). The Court determined that overhead is a proper item for determining whether a well is producing in paying quantities. *See id*.

However, in *Ladd*, the Fort Worth Court declined to follow *Skelly Oil* because it did not directly address the issue of *administrative* and district expenses. *See Ladd*, 695 S.W.2d at 108-09. The Court held that these expenses should not be considered as overhead because they continue whether or not the well is producing. *Id*. at 108. "Ordinary business experience would indicate that as the elimination of a single well would not materially reduce such expense, it should not be included as overhead." *Id*. Thus, the trial court erroneously overruled Ladd's motions to exclude administrative and district expenses from a determination of paying quantities. *Id*. at 109.

We agree that a distinction exists between overhead directly related to production and that involving administrative expenses which continue whether or not the well is producing. *See Ladd*, 695 S.W.2d at 108. The record does not indicate that BoMar's overhead fees are directly associated with production from the well. Ziegler's testimony demonstrates that these fees involve administrative expenses. BoMar did not present evidence suggesting otherwise. The evidence is legally and factually sufficient to support a finding that Loyd should not be charged with administrative overhead expenses, engineering fees, or supervision fees in this case.

**Well Purchase**

BoMar paid $45,000 for the Dodge and the Sneed. BoMar initially charged the Dodge with the entire purchase, but later reimbursed Loyd $22,500, the portion representing the cost of the Sneed. The bill of sale indicates that BoMar purchased the well head tree with valves, casing, tubing, and a line heater.

Seeking reimbursement for his share of the Dodge purchase, Loyd testified that unleased mineral interest owners are not responsible for expenses incurred before reworking because these are "risk costs" incurred by the operator and are not reasonable and necessary to re-work, produce, or market. He explained that reworking begins when the rig is physically moved onto the hole and the operator begins the re-entering process. Loyd admitted that purchase of a well head, casing, or tubing would be a reasonable and necessary expense if the well was not already equipped with these items. According to Ziegler, BoMar's acquisition of equipment, such as the well bore, is part of acquiring the lease interest.

Citing *Burnham v. Hardy Oil Co.*, (Tex. Civ. App.—San Antonio 1912), *aff'd*, 195 S.W. 1139 (Tex. 1917), in which the San Antonio Court stated that necessary and reasonable costs of production include the "cost of the machinery and appliances," BoMar contends that the equipment it purchased is a necessary and reasonable cost of production. *Burnham*, 147 S.W. at 334. Loyd, however, contends that the purchase of the well constitutes a pre-drilling cost for which he is not responsible.

*Burnham* does not address the distinction between original drilling and reworking. The Texas Administrative Code defines "drilling" as "activities designed

and conducted in an effort to obtain *initial* production from a well."  31 TEX. ADMIN. CODE § 9.31(b)(2) (2009) (emphasis added).  "Reworking" constitutes "activities designed and conducted *on* a well in an effort to restore or to enhance production in paying quantities from an *existing* well."  *Id*. at § 9.31(b)(8) (emphasis added).  Thus, in the context of re-working, "drilling" involves the actual efforts to restore or enhance the well.  Purchase of the well head, casing, tubing, and line heater is an event that occurs before the re-working phase begins.  Moreover, in *Abraxas*, the Austin Court noted that "one-time investment expenses, such as drilling and equipping costs, are to be treated as capital expenditures" and are excluded from the definition of "marketing and operating costs."  *Abraxas*, 20 S.W.3d at 756.

In fact, Kirsch testified that an unleased mineral interest owner does not put up any money for the project or agree to take any risks.  Preston testified that he and two investors each paid $15,000 for the purchase of both wells.  Two other partners paid a total of $11,000.  He and Kirsch both agreed that BoMar has recovered most of the purchase price.  BoMar's purchase of the well equipment was a one-time investment expense assumed by BoMar and excluded from the definition of "operating and marketing expenses."  *See Abraxas*, 20 S.W.3d at 756.  The evidence is legally and factually sufficient to support a finding that purchase of equipment is an expense for which an unleased mineral interest owner is not responsible.

**Pettit Zone Workover**

BoMar spent several thousand dollars testing the shallow Pettit zone before the deeper Cotton Valley zone.  Loyd testified that the deepest zone should be tested first

because shallower zones involve substantially higher costs, given the need to also test deeper zones, and the risk of losing the well bore. Loyd explained in detail that testing shallow zones complicates well bore mechanics because of the need to squeeze off the shallower zone after testing. Reviewing the well schematic, Loyd explained that the Pettit had been tested in 1998 and found to be non-productive. He explained that the prior operator properly tested the deeper zone first because of the minimal expense involved compared to the expense of squeezing off a shallow zone. According to Loyd, a conventional work-over would have cost about $5,000. He testified that $64,642 of the testing was unnecessary and unreasonable, identifying the following expenses: (1) Pro Perforating, L.L.C. for $1,536;[6] (2) Reliance Well Service, Inc. for $401 and $1,645; (3) Wireline, Inc. for $1,091; and (4) G & G Equipment Co., Inc. for $3,712 and $816. Because BoMar had to drill out a bridge plug to get to Cotton Valley, Loyd did not include this cost in his calculation.

Ziegler confirmed that the Pettit was tested in 1998 and found non-productive, but admitted that this testing was done at slightly different depths than when tested by BoMar. Ziegler further testified that BoMar tested the Pettit out of sequence, meaning that operators typically start at the bottom of a well and work up. He testified that the testing would not have been done had BoMar followed proper oilfield sequencing and procedures. Ziegler opined that doing so delayed both payout and payment of revenues. He further explained that BoMar purchased tubing around the time of the

---

[6] Loyd testified to $1,836; however, this excluded a $300 discount applied if the bill were paid within thirty days. The discount was apparently applied, as evidenced by BoMar's transaction report.

testing. Assuming the tubing was purchased for the Pettit, the entire amount could be credited as unnecessary and unreasonable. An invoice from Trident Steel Corp. shows the cost of tubing as $12,873. After reviewing invoices and disregarding charges for work that needed to be done, Ziegler identified $33,328 in improper charges for the Pettit zone testing. He too omitted the cost of removing the bridge plug.

Preston testified that he had previously produced from a lower zone in the area, which led him to test the Pettit to determine whether it could also produce. He admitted that the Pettit was previously tested and found non-productive, but that BoMar tested at a lower depth. Had he attempted Cotton Valley first, BoMar would not have tried to perforate the Pettit at all, but would have had to squeeze off the Pettit because of open perforations from prior testing.

Kirsch agreed that operators normally test the deepest zone first and admitted that beginning in the shallowest zone is unusual, but not unheard of. He testified that BoMar's testing followed industry practice. He also testified that the testing was reasonable, although at his deposition he stated that the techniques used were reasonable, making no determination as to the reasonableness of the actual testing.

BoMar contends that Loyd's testimony is conclusory on the issue of the Pettit testing. However, Loyd explained why the testing was unreasonable and unnecessary, taking into account proper expenses involving work that had to be completed even without testing the Pettit first. *See Beaumont*, 205 S.W.3d at 621. Moreover, BoMar is not entitled to recoup "expenditures [that] did not actually extend the leasehold estate," such as unsuccessful reworking operations. *Shaw*, 299 S.W.2d at 314; *see Neeley v.*

*Intercity Mgmt. Corp.*, 732 S.W.2d 644, 647 (Tex. App.—Corpus Christi 1987, no pet.) ("Appellees were not entitled to recover for speculative efforts to preserve the common estate, if unsuccessful."); *see also Willson v. Superior Oil Co.*, 274 S.W.2d 947, 950 (Tex. Civ. App.—Texarkana 1954, writ ref'd n.r.e.) ("[I]f a co-tenant drills a dry hole, he does so at his own risk and without right to reimbursement from his co-tenant (in the absence of an agreement therefor) for the drilling costs.").  The evidence is legally and factually sufficient to support a finding that this unleased mineral interest owner is not responsible for the costs of unsuccessful testing.

**Hydraulic Fracture Treatment in the Cotton Valley Zone**

According to BoMar's final statement for the Dodge and a handwritten invoice to working interest owners, BoMar spent approximately $91,967 on a hydraulic fracture treatment performed in Cotton Valley.

Loyd opined that BoMar prematurely conducted the fracture stimulation.  He explained that the fracture insignificantly increased production from 100 MCF per day to 110 MCF per day.  He admitted that the flow rate had continued to increase, but testified that this would have occurred with natural clean-up of the well had BoMar allowed the well time to clean-up and increase in flow on its own.  Loyd testified that the fracture neither increased the reserves, as the same amount of hydrocarbons would ultimately be recovered, nor accelerated the pay-out date.  Loyd testified that $82,656 of the cost is unreasonable and unnecessary.

Ziegler testified that a portion of the fracture costs were unreasonable and unnecessary.  The well was swabbed several days in a row, the last two of which

Ziegler opined were unnecessary because, other than a few barrels of liquid, all the fluid had come out of the well. Also, BoMar purchased new tubing to complete the string of existing tubing to reach the bottom of the well, but Ziegler testified that used tubing could have been purchased at less expense. Ziegler further testified that the fracture was too large and too costly because BoMar perforated the well with 30 holes and used 120,000 pounds of sand total, when 2,000 pounds of sand per hole is appropriate. Ziegler further opined that BoMar could have obtained a larger discount than that received from Schlumberger, the company performing the treatment. Whether the job was too large or BoMar could have obtained an additional fifteen percent discount, $25,200 could have been saved. Ziegler opined that $35,087 of the fracture charges were unnecessary and unreasonable. Alternatively, Ziegler testified that the *entire* fracture treatment could be deemed unreasonable and unnecessary. He admitted that wells in the area are often fractured, but explained that the fracture treatment failed to create much of an increase in the flow rate. Thus, Loyd would be entitled to $25,000 in reimbursement.

Kirsch testified that he is familiar with the practice of completing wells in Cotton Valley and that he has never seen a well completed in Cotton Valley without a fracture. He explained that existing tubing and casing can be used if it can withstand the pressure. According to Kirsch, some cement plugs and a cast iron bridge plug had to be drilled out to get to the Cotton Valley. Preston testified that he had fractured other wells in the area. He explained that the tubing would have to withstand high pressures

and he wanted "tubular integrity." He explained that after about six months, the flow had increased to more than 250 MCF per day.

BoMar contends that Loyd's testimony is conclusory. We disagree. Loyd explained that the fracture was performed prematurely because the flow rate could have increased on its own without incurring the added expense of a fracture and that the fracture was unnecessary because it failed to increase the flow rate. Even without his testimony, Ziegler's testimony supports these conclusions. The jury was entitled to accept Loyd's position that the fracture was unreasonable and unnecessary and reject BoMar's contrary position. *See City of Keller,* 168 S.W.3d at 819; *see also Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761 (Tex. 2003); *Hinkle v. Hinkle,* 223 S.W.3d 773, 778 (Tex. App.—Dallas 2007, no pet.). The evidence is legally and factually sufficient to support a finding that the hydraulic fracture treatment was an unnecessary and unreasonable expense for which an unleased mineral interest owner is not responsible.

**Damages**

Having found that the above expenses are unreasonable and unnecessary, we must now determine whether the evidence supports an award of $72,162 in damages for these expenses. To be sufficient, the testimony "must be based on objective facts, figures, or data from which the amount of lost profits may be ascertained" with "reasonable certainty." *Szczepanik v. First S. Trust Co.,* 883 S.W.2d 648, 649 (Tex. 1994); *Paradigm Oil, Inc. v. Retamco Operating, Inc.,* 242 S.W.3d 67, 74 (Tex. App.—San Antonio 2007, pet. denied). Otherwise, it is speculative and conclusory and will not support a judgment. *Paradigm Oil,* 242 S.W.3d at 74.

We first note that there are several expenses to which Loyd and/or Ziegler testified that BoMar does not challenge: (1) $200 for a drilling permit; (2) $30 for an investor lunch; (3) $7,138 for landman fees; (4) $2,615 for various work done by B.D. Dotson; and (5) $36,250 for attorney's fees. These amounts are also supported by documentary evidence. Loyd possesses a .3055555 interest, bringing his proportionate share of these expenses to $14,127.

Of the disputed expenses, the record demonstrates that Loyd's share of the purchase price is $6,875 and $367 for engineering. These amounts are based on the purchase and engineering costs identified in BoMar's transaction report. As for overhead, the jury could accept either Loyd's testimony supporting $917 in reimbursement for five months of overhead or Ziegler's testimony supporting $14,299 in reimbursement for six and a half years of overhead. Ziegler's testimony brings the balance to $35,668.

As for the supervision fees, Loyd testified to $5,347 in reimbursement for twenty-five days of supervision fees. This amount is based on the $17,500 identified in BoMar's transaction report. Ziegler testified that Loyd is entitled to $7,714 in reimbursement for supervision fees, but did not explain how he reached this number and the record does not so indicate. Taking the $5,347 identified by Loyd increases the balance to $41,015.

Loyd further testified that $64,642 of the Pettit testing was unnecessary and unreasonable, but identified a mere $9,201 in specific expenses. Ziegler, however, identified $33,328 in improper charges, entitling Loyd to $10,183. BoMar does not challenge his testimony. Ziegler's testimony brings the balance to $51,198.

Finally, Loyd testified that $82,656 of the fracture treatment was unnecessary and unreasonable. Again, he failed to explain how he formulated this number. Yet, BoMar does not challenge Ziegler's testimony identifying $35,087 in unreasonable and unnecessary costs. This amount entitles Loyd to $10,721. However, Ziegler also testified that Loyd would be entitled to $25,000 were the fracture deemed unnecessary and unreasonable. Because the testimony is sufficient to allow the jury to conclude that the entire cost of the fracture was unnecessary and unreasonable, Loyd's share of this cost brings the balance to $76,198. The jury's award is, therefore, supported by the evidence. We overrule issue one.

**ATTORNEYS FEES**

In issue eleven, BoMar contends that Loyd is not entitled to attorney's fees.

"[A] prevailing party cannot recover attorney's fees from an opposing party unless permitted by statute or a contract between the parties." *Holland v. Wal-Mart Stores, Inc.*, 1 S.W.3d 91, 95 (Tex. 1999). There is no contract between BoMar and Loyd. Because Loyd is not a consumer under the DTPA, he cannot recover attorney's fees under that statute. *See Parkway Co. v. Woodruff*, 901 S.W.2d 434, 441 (Tex. 1995) ("In the absence of recovery under the DTPA, there is no basis for the recovery of attorney's fees in this case."). Loyd alleged no other statutory claim that would entitle him to attorney's fees.[7] We sustain issue eleven.

---

[7] BoMar points out that Loyd could recover attorney's fees under the Natural Resources Code, but Loyd did not bring such a claim. *See* TEX. NAT. RES. CODE ANN. § 91.402 (Vernon Supp. 2008) (timely payment of oil and gas proceeds); *see also* TEX. NAT. RES. CODE ANN. § 91.404 (Vernon 2001) (non-payment of oil and gas proceeds); TEX. NAT. RES. CODE ANN. § 91.406 (Vernon 2001) (attorney's fees).

## EXEMPLARY DAMAGES

In issue twelve, BoMar contends that Loyd is not entitled to statutory or exemplary damages. The jury awarded $100,000 in exemplary damages for fraud and $200,000 for DTPA. Because Loyd's DTPA and fraud claims are unsupported by the evidence, he is not entitled to exemplary damages. *See Twin City Fire Ins. Co. v. Davis*, 904 S.W.2d 663, 665 (Tex. 1995) ("[R]ecovery of punitive damages requires a finding of an independent tort with accompanying actual damages."). We sustain issue twelve.

## INTEREST

In issue thirteen, BoMar argues that Loyd is not entitled to prejudgment interest.

"[A] prevailing plaintiff may recover prejudgment interest on damages that have accrued by the time of the judgment." *Matthews v. DeSoto*, 721 S.W.2d 286, 287 (Tex. 1986). There are two legal sources for an award of prejudgment interest: (1) general principles of equity; and (2) an enabling statute. *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998). Loyd contends that he is entitled to prejudgment interest as the prevailing party recovering a money judgment. Citing *Concord Oil Co. v. Pennzoil Exploration & Prod. Co.*, 966 S.W.2d 451 (Tex. 1998), BoMar contends that equitable prejudgment interest cannot be awarded when the Natural Resources Code applies.

Section 91.402 of the Natural Resources Code provides that oil and gas payments may be withheld without interest beyond the time limits prescribed in section 91.402(a) if there is a dispute concerning title that would affect distribution of payments. TEX. NAT. RES. CODE ANN. § 91.402(b)(1) (Vernon Supp. 2008). If payments are withheld or

suspended in accordance with section 91.402(b), the Payor is not required to pay interest on the late payments. TEX. NAT. RES. CODE ANN. § 91.403(b) (Vernon 2001). In *Concord Oil*, the Texas Supreme Court stated, "The Legislature has indicated very clearly in the Natural Resources Code that prejudgment interest is not due when disputes exist between a 'payor' and a 'payee' over oil and gas titles." *Concord Oil*, 966 S.W.2d at 463. Thus, "an award of equitable prejudgment interest would be directly at odds with [section 91.402]." *Id*. at 462; *see Gore Oil Co. v. Roosth*, 158 S.W.3d 596, 602 (Tex. App.—Eastland 2005, no pet.) ("A title dispute clearly existed in this case, and prejudgment interest was not authorized.").

Before suit was filed, BoMar and Loyd disagreed about the amount of Loyd's interest, Loyd claiming that he had a .401873 interest rather than a .3055555 interest. As a result, BoMar suspended payments. After suit was filed, Loyd stipulated to an amount of interest in order to receive payments from BoMar and admitted at trial that his interest is .3055555, as BoMar had originally suggested. At a hearing on Loyd's motion to enter judgment, Loyd's counsel informed the trial court that Loyd did not allege a claim under the Natural Resources Code.

It is apparent that section 91.402 applies in this case, given the dispute over title. Loyd was not entitled to interest either equitably or statutorily. *See Concord Oil*, 966 S.W.2d at 463; *see also Gore Oil*, 158 S.W.3d at 602. We sustain issue thirteen.

**CONCLUSION**

Having found that Loyd cannot prevail on his claims for DTPA violations, fraud, and prejudgment interest, we modify the judgment to delete the awards of $61,823 in

attorney's fees, $200,000 in exemplary damages for the DTPA claim, $100,000 in exemplary damages for the fraud claim, and $19,779.36 in prejudgment interest. We further modify the judgment to reduce the award of $73,162 in actual damages to $72,162. The judgment is affirmed as modified.

                                        FELIPE REYNA
                                        Justice

Before Chief Justice Gray,
        Justice Reyna, and
        Justice Davis
        (Chief Justice Gray concurring and dissenting with note)*
Affirmed as modified
Opinion delivered and filed July 15, 2009
[CV06]

*        (Chief Justice Gray does not join the Court's opinion. A separate opinion will not issue. He notes that notwithstanding the discussion under the heading "INTEREST" in the Court's opinion, it is clear from the remainder of the opinion that this dispute was not about title. This dispute was about what expenses could properly be charged against an unleased mineral owner's share of production. There has not been a dispute about title since September 13, 2004. Therefore, because Section 91.402 of the Natural Resources Code is not applicable to the dispute since that date, it does not give BoMar a right to not pay what BoMar agreed it owed Loyd and because BoMar paid nothing to Loyd, it now owes Loyd prejudgment interest. There is absolutely no part or portion of the trial court's or this Court's judgment that addresses or purports to resolve a title dispute because that issue was taken out of the case by Loyd's stipulation. Because the Court deprives Loyd of all prejudgment interest, I respectfully dissent to that portion of the judgment and concur only in the remainder of the judgment of the Court.)