IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-10-00452-CV

No. 10-10-00453-CV

No. 10-10-00454-CV

 

In
the Interest of

L.A.M.,
Jr., J.L.L., W.H., J.M.L. and A.A.L., Children,

 

 

 



From the 12th District
Court

Madison County, Texas

Trial Court Nos. 09-11990-012-09,
09-11991-278-09 and 09-11992-012-09

 



ORDER



 

Maurice L. is the biological father of
J.M.L. and was also the permanent managing conservator of L.A.M., Jr., J.L.L.,
W.H., and A.A.L.  The Texas Department of Family and Protective Services filed
three suits for protection of the children, and the cases were tried to one
jury.  Based upon the jury verdict, the trial court entered a final order
terminating Maurice’s parental rights to J.M.L. and naming the Department as
permanent managing conservator of all the children.[1]

            Maurice filed a motion for
new trial and a statement of points or issues to be presented on appeal as
required by Tex. Fam. Code Ann. §
263.405 (b) (West 2008).  The trial court held a hearing and found each point
to be frivolous.  The trial court did not allow Maurice a copy of the complete
reporter’s record.

            In each cause number,
Maurice argues in his third issue that he is entitled to a full record on
appeal based upon his claim of ineffective assistance of counsel.  Maurice
raised his ineffective assistance claim in his statement of points on appeal. 
An indigent parent is entitled to a full record on appeal when raising an
ineffective assistance of counsel claim, even when the claim is not raised in
the statement of appellate points.  See In re B.G., 317 S.W.3d 250 (Tex.
2010).  A claim of ineffective assistance cannot be adequately presented in the
absence of a full record and an indigent parent would be denied due process
without a full reporter’s record.  See In re B.G., 317 S.W.3d at
256-7.  We sustain Maurice’s third issue on appeal.  We need not address
Maurice’s remaining issues on appeal.  Tex.
R. App. P. 47.1.

            We order the court reporter
in this case to prepare a full record from the trial, and we further order the
parties to proceed to file new briefs once the record is filed.

 

 

                                                                                    PER
CURIAM

 

Before
Chief Justice Gray, 

            Justice
Davis, and

            Justice
Scoggins

Order
issued and filed July 6, 2011

Publish








 









[1] Maurice is the only party to this
appeal.








for which it
was entitled to be reimbursed.  That TXO did not intend to make a profit for
what it did is a factor to be weighed.  Appellant would contend that pursuant
to Cameron v. Terrell & Garrett,
Inc., 618 S.W.2d
535 (Tex. 1981), even if Appellant had not purchased services
from TXO, he purchased from the suppliers of TXO.  Although Cameron
eliminated the privity requirement, and even assuming Appellant was a purchaser
in this context, the suppliers did not provide the services which form the
basis of the complaint and Cameron is not applicable.  The purpose of
operating agreements, being to spread the risk of drilling operations among
several investors with the operator managing the books and making disbursements
from a joint account for the benefit of all involved in the J.O.A., should not
be construed, we believe, to create liabilities under the Act. 

 

Id.; C & C Partners v. Sun Exploration & Prod. Co., 783 S.W.2d 707, 712-13 (Tex.
App.—Dallas 1989), disapproved of on other grounds by Formosa
Plastics Corp. United States v. Presidio Eng’rs & Contrs., 960 S.W.2d
41 (Tex. 1998); see Taylor v. GWR Operating Co., 820 S.W.2d 908, 910
(Tex. App.—Houston [1st Dist.] 1991, writ denied); see also Johnston
v. Am. Cometra, 837 S.W.2d 711, 717-18 (Tex. App.—Austin 1992, writ
denied).

In Cox v. Davison, 397 S.W.2d
200 (Tex. 1965), the Supreme Court explained, “[W]hen mineral property is developed by one
cotenant and as a result thereof he acquires minerals which at one time
underlay the common property, the problem of accounting to the nonconsenting
cotenant arises.”  Cox, 397 S.W.2d at 201-02.  The right of one cotenant to appropriate
the property of another is sanctioned only because the mineral estate is such
that necessarily the rights of one cotenant must be interfered with if another
cotenant is to be permitted to exercise those rights properly belonging to him.
 Id. at 203.  As between the producing cotenant and the nonjoining
cotenant a balance of equities has been struck.  Id.  The rule of
accountability is the proportionate market value of the product less the
proportionate necessary and reasonable costs of producing and marketing.  Id.

            When addressing whether nonconsenting
cotenants were entitled to interest on the “proportionate part of the
money advanced [] to pay for producing and selling the minerals,” Cox
quoted
Shaw & Estes v.
Texas Consolidated Oils,
299 S.W.2d 307 (Tex. Civ. App.—Galveston 1957, writ ref’d n.r.e.): 

With reference to money necessarily
and beneficially spent, the [Supreme Court] continues: “* * * the principle
of contribution has no element of speculation in it.  In cases of this
kind it is implied that the person seeking contribution had authority from his
cotenant to expend the money that was actually spent.  It is the same as if he
had been actually instructed by his cotenant to expend that much money
for him in improving the lot.  This much is implied by law.”  Because the
principle is so well known, it is unnecessary to cite authority for the
proposition that a cotenant incurring speculative expense in connection
with exploration and development of oil, gas, and mineral properties is not
entitled to a personal judgment against his cotenant for reimbursement, but
only to be reimbursed out of production if and when production results. 

 

Shaw, 299 S.W.2d
at 313 (quoting Stephenson v. Luttrell,
179 S.W. 260, 263 (Tex. 1915)); Cox,
397 S.W.2d at 201-02.

In light of Hamilton and Cox,
BoMar contends that (1) a non-consenting cotenant has no obligation to pay the
costs of development because he is not seeking or acquiring development of the
oil or gas; and (2) just as parties to a joint operating agreement are not
consumers, neither is a non-consenting cotenant.  Loyd maintains that he is a consumer by
involuntarily acquiring goods or services.  See Allied Towing Service v. Mitchell, 833 S.W.2d 577, 582 (Tex. App.—Dallas
1992, no writ) (“A party
who involuntarily
acquires services can qualify as a consumer under the DTPA”); see also D/FW Commercial
Roofing Co. v. Mehra, 854 S.W.2d 182, 187 (Tex. App.—Dallas 1993, no
writ) (“It is not necessary
that the consumer who ‘acquires’ the services be the one who sought the
services.”).  Loyd
contends that Cox “actually implies that an unleased cotenant like Loyd does
acquire the goods and services that go into production, by recognizing the
money paid by the operating cotenant to be ‘money advanced…to pay for
produc[tion and marketing costs].”  See
Cox, 397 S.W.2d at 201;
see also Shaw, 299 S.W.2d at 313.  He contends that Hamilton is inapplicable because
it is based on the “consensual contractual relationship” between operators and
working interest owners.

While an unleased mineral interest owner
is not a party to a joint operating agreement, Hamilton and Cox
shed light on whether an unleased mineral interest owner is a consumer.  A
joint operating agreement “spread[s] the risk of drilling operations” and
requires parties to the agreement to reimburse the operator for certain
expenses incurred on their behalf.  Hamilton, 648 S.W.2d at 322.  The
law similarly requires Loyd, a non-consenting cotenant, to reimburse BoMar for
proportionate necessary and
reasonable costs of marketing
and production.  See Cox,
397 S.W.2d at 203.  Loyd is correct that “[i]t
is the same as if [BoMar] had been actually instructed by [Loyd] to expend that
much money for him.”  Shaw, 299 S.W.2d at 313.  This does not make Loyd a consumer.  Like
parties to an operating agreement, who are not consumers under the DTPA, Loyd
simply reimbursed BoMar for
certain costs incurred on his behalf.  See Hamilton, 648 S.W.2d at 322; see also Cox, 397 S.W.2d at 203.  We cannot say that
Loyd was a consumer for purposes of the DTPA.  We sustain issue two and need
not address issues three, four, five, six, seven, or eight addressing the legal
and factual sufficiency of the evidence to support Loyd’s DTPA claim.  See
Tex. R. App. P. 47.1.

LEGAL AND FACTUAL SUFFICIENCY

            In several issues, BoMar
challenges the legal and factual sufficiency of the evidence to support the
jury’s findings on Loyd’s other claims and award of damages.

Under legal
sufficiency review, we ask “whether the evidence at trial would enable
reasonable and fair-minded people to reach the verdict under review” and credit
favorable evidence if reasonable jurors could, and disregard contrary evidence
unless reasonable jurors could not.  City of Keller v. Wilson, 168
S.W.3d 802, 827 (Tex. 2005).

Under factual sufficiency review of
issues where the appellant did not bear the burden of proof, we “consider and
weigh all of the evidence” and reverse only if the verdict is “so contrary to
the overwhelming weight of the evidence that the verdict is clearly wrong and
unjust.”  Checker Bag
Co. v. Washington, 27
S.W.3d 625, 633 (Tex. App.—Waco 2000, pet. denied).  On issues where the appellant bears the
burden of proof, we reverse only if, “considering all the evidence, the finding
is so contrary to the great weight and preponderance of the evidence as to be
manifestly unjust.”  Id.

Fraud

In issue nine, BoMar challenges the legal
and factual sufficiency of the evidence to support Loyd’s fraud claim,
specifically the elements of reliance and injury.[2]

A plaintiff establishes reliance by showing
the defendant’s acts
and representations induced
him to either act
or refrain
from acting, to his detriment. Marcontell v. Jacoby, 260 S.W.3d 686, 691 (Tex. App.—Dallas 2008, no pet.).  For example, in TCA Building
Co. v. Entech, Inc., 86 S.W.3d 667 (Tex. App.—Austin 2002, no pet.), TCA
rejected an offer made in a release and supplement, but alleged fraud on the
basis of representations made therein.  TCA, 86 S.W.3d at 674-75.  The Austin Court held that rejection of the offer was “inherently
inconsistent with the reliance required for a fraud action.”  Id. at 675.  A finding of reliance was precluded because “no dependence or
confidence is placed upon the representation as a basis for a claim of legal
right.”  Id. 

Here, after numerous requests from Loyd,
BoMar provided information identifying expenses that it claimed were chargeable
against Loyd’s interest.  Upon receipt of this information, Loyd immediately
questioned numerous of these expenses and requested additional information.  He
continued challenging BoMar’s information and eventually expressed an
unwillingness to pay certain expenses.  At trial, Loyd explained why he
requested information from BoMar:

I just need the information that I --
I’m entitled to so I can make a determination as to what’s owed me and -- and
what -- what the revenue is, what the arrangements are to sell the -- the
products, the gas and the oil, and how the facilities are set up so I can
determine what’s reasonable and not -- not reasonable, what costs are -- what
the costs are, first and foremost, and then, second, what are reasonable and
necessary costs. 

 

Loyd explained that an accounting would
enable him to determine whether costs are reasonable and necessary in order to
determine what amount he is owed and whether he was underpaid due to improper
charges.  

As evidenced by his own testimony, Loyd did
not rely on BoMar’s representations.  At
no time before trial did Loyd accept the numbers provided by BoMar or accept
payment from BoMar.  Rather, he was apparently suspicious of these
representations and sought to evaluate the accuracy of BoMar’s representations
for himself.  He never placed any dependence or confidence upon BoMar’s
representations.   See
TCA, 86 S.W.3d at 675.  Although the
evidence certainly suggests that BoMar intended that Loyd rely on its
representations, we cannot say that the evidence is legally and factually
sufficient to show that Loyd actually relied on those representations.  We
sustain issue nine.

In light of our finding that Loyd cannot
prevail on his DTPA and fraud claims, we need not address his tenth issue
challenging the legal and factual sufficiency of the evidence to support the
jury’s award of $73,162 in damages for those claims.  See Tex. R. App. P. 47.1.[3]

Accounting

In issue one, BoMar contends that the evidence is legally and factually
insufficient to support the jury’s finding that $72,162 in unreasonable and
unnecessary costs were charged against Loyd’s proportionate share of
production.

A cotenant may “extract minerals from
common property without first obtaining the consent of his cotenants; however, he must account to
them on the basis of the value of any minerals taken, less the necessary
and reasonable costs of production and marketing.”  Byrom v. Pendley, 717 S.W.2d 602, 605 (Tex. 1986)
(emphasis added); see Cox, 397 S.W.2d at 201.  Loyd testified to several
allegedly unnecessary and unreasonable costs deducted from his share of production. 
BoMar challenges Loyd’s evidence
regarding overhead, supervision, and engineering fees, the well purchase, testing of the Pettit zone, and a hydraulic
fracture treatment performed in the Cotton Valley zone.

Overhead, Supervision, and Engineering
Fees  

Loyd, a petroleum engineer and operator,
testified that overhead, supervision, and engineering fees are unrelated to
re-entering, producing, or marketing, but are costs assumed by BoMar and its
investors.  He is not a party to a joint operating agreement and did not agree
to share in any of these costs.  Moreover, Loyd testified that during several
months, BoMar charged the Dodge well $600 a month for overhead, but charged
nothing to another well, the Sneed.  Relying on BoMar’s transaction report, he
testified to $3,000 in overhead fees at $600 per month for five months, $17,500
in supervision fees at $700 per day for twenty-five days, and $1,200 in engineering
fees.

Loyd’s expert witness, Edward Ziegler,
testified that overhead represents administrative fees, such as rent,
telephones, employees, and costs of running the business, that are chargeable
by contract alone.  He explained that these fees are listed in an operating
agreement.  He testified
that Loyd was entitled to $14,299 in reimbursement for six and a half years
worth of overhead charged since the Dodge began producing in January 2001. 
Taking into consideration that some supervision fees might involve work
performed on the well, Ziegler testified that Loyd should be reimbursed $7,714
for supervision fees.   

BoMar’s expert, Don Kirsch, testified
that BoMar’s overhead fees are consistent with industry practice, per the
counsel for petroleum accountants.  L.B. Preston, BoMar’s president, testified
that $600 a month for overhead is reasonable and necessary, describing himself
as “cheap” compared to amounts charged by other operators.  He admitted
sometimes charging the Dodge and not the Sneed, but claimed that the two are
unrelated because the Sneed was not a good well, so he stopped charging
overhead in order to help investors.  Preston further explained that
supervision fees involve his being on location each day making decisions and
giving instructions.  Engineering fees involve evaluating the well bore,
checking pressures, helping design fracture treatments, contacting parties, and
other engineering-type work.

On appeal, BoMar contends that Loyd’s
and Ziegler’s testimony is conclusory and speculative.[4] 
Opinion testimony that is conclusory or speculative is not relevant evidence,
because it does not tend to make the existence of a material fact “more
probable or less probable.”  Coastal
Transp. Co. v. Crown Cent. Petroleum Corp., 136 S.W.3d 227, 232 (Tex. 2004).  Expert testimony is considered “conclusory or
speculative” when it has no factual substantiation in the record.  Beaumont v. Basham, 205 S.W.3d 608, 621 (Tex. App.—Waco
2006, pet. denied).  Loyd
and Ziegler both explained why overhead, supervision, and engineering fees are
not chargeable to an unleased mineral interest owner.  See Beaumont, 205 S.W.3d at 621.  The testimony is neither conclusory nor speculative.

BoMar further contends that overhead constitutes a chargeable production
cost:  

In the context of an oil and gas lease,
the term “production” has been construed to mean a well which pays a profit,
however small, over operating and marketing expenses, even though it may
never repay its costs and the enterprise as a whole may prove
unprofitable.  This definition should apply equally to the phrase “producing in
paying quantit[ies].”  Operating and marketing expenses include taxes, overhead
charges, labor, repairs, and depreciation on salvable equipment, but not
costs or expenses in connection with the original drilling of the well or
reworking expenses. Periodic cash expenditures incurred in the daily operation
of a well (sometimes called out-of-pocket lifting expenses) are classified as
operating expenses, while one-time investment expenses, such as drilling and
equipping costs, are to be treated as capital expenditures.  Reworking
expenses are part of the capital investment.  

 

Abraxas Petroleum Corp. v. Hornburg, 20 S.W.3d 741, 756 (Tex. App.—El Paso
2000, no pet.) (emphasis added) (internal citations omitted); see United
Cent. Oil Corp. v. Helm,
11 F.2d 760, 762 (5th Cir.
1926) (overhead charges should have been considered as part of the expense of
operating the well).  BoMar suggests that overhead should likewise be
considered a reasonable cost of production when accounting to an unleased
mineral interest owner.[5]

Loyd contends that a
production-in-paying-quantities analysis should not apply because it does not address
allocation of expenses, involves a contractual relationship usually allowing
recovery of overhead charges, and focuses on when production increases the
lease term and post-completion costs.  We disagree.  Production of a well
involves actually taking oil or gas from the well in a captive state for either
storing or marketing the product for sale. 
Riley v. Meriwether, 780 S.W.2d 919, 923 (Tex. App.—El Paso 1989, writ
denied).  “[T]he
terms ‘produced’ and ‘produced in paying quantities’ mean substantially the
same thing.”  Clifton v. Koontz, 325 S.W.2d 684, 690 (Tex. 1959).  Abraxas’s definition of “operating and
marketing expenses” guides our analysis of which expenses are associated with the actual production from the
well.     

            Citing Skelly Oil Co. v. Archer, 356 S.W.2d
774 (Tex. 1961) and Ladd Petroleum Corp. v. Eagle Oil & Gas Co., 695 S.W.2d 99 (Tex. App.—Fort Worth
1985, writ ref’d n.r.e.), Loyd further contends that the type of
overhead charged by BoMar, i.e., administrative overhead, is unreasonable and
unnecessary, even under a production-in-paying-quantities analysis, because it
cannot be traced to actual production of the well:    

As to the overhead charges, Mr. Cage in
his address concludes that they are more difficult for the lessee to explain
than depreciation.  He concludes that those items of overhead charges which can
be traceable to the actual expense of production of the well’s product for marketing
should be considered in determining whether or not the well is producing in
paying quantities.

 

Skelly Oil, 356 S.W.2d at 781-82 (citing Edwin M.
Cage, Production in Paying Quantities: Technical Problems Involved, 10th
Annual Institute on Oil and Gas Law and
Taxation 61, 90 et seq. (1959)).  The Court determined that overhead is
a proper item for determining whether a well is producing in paying quantities. 
See id.  

However, in Ladd, the Fort Worth Court declined to follow Skelly Oil because it did not directly address the
issue of administrative and district expenses.  See Ladd, 695 S.W.2d at 108-09.  The Court held
that these expenses should not be considered as overhead because they continue
whether or not the well is producing.  Id. at 108.  “Ordinary business experience would
indicate that as the elimination of a single well would not materially reduce
such expense, it should not be included as overhead.”  Id.  Thus, the
trial court erroneously overruled Ladd’s motions to exclude administrative and district expenses from a determination
of paying quantities.  Id. at 109.  

We agree that a distinction exists
between overhead directly related to production and that involving
administrative expenses which continue whether or not the well is producing.  See
Ladd, 695 S.W.2d at 108.  The record does
not indicate that BoMar’s overhead
fees are directly associated with production from the well.  Ziegler’s
testimony demonstrates that these fees involve administrative expenses.  BoMar
did not present evidence suggesting otherwise.  The evidence is legally and
factually sufficient to support a finding that Loyd should not be charged with administrative
overhead expenses, engineering fees, or supervision fees in this case. 

Well Purchase

BoMar paid $45,000 for the Dodge and the
Sneed.  BoMar initially charged the Dodge with the entire purchase, but later
reimbursed Loyd $22,500, the portion representing the cost of the Sneed.  The
bill of sale indicates that BoMar purchased the well head tree with valves,
casing, tubing, and a line heater.  

Seeking reimbursement for his share of
the Dodge purchase, Loyd testified that unleased mineral interest owners are
not responsible for expenses incurred before reworking because these are “risk
costs” incurred by the operator and are not reasonable and necessary to
re-work, produce, or market.  He explained that reworking begins when the rig
is physically moved onto the hole and the operator begins the re-entering
process.  Loyd admitted that purchase of a well head, casing, or tubing would
be a reasonable and necessary expense if the well was not already equipped with
these items.  According to Ziegler, BoMar’s acquisition of equipment, such as the
well bore, is part of acquiring the lease interest.

Citing Burnham v. Hardy Oil Co., (Tex.
Civ. App.—San Antonio 1912), aff’d, 195 S.W. 1139 (Tex. 1917), in which the
San Antonio Court stated that necessary
and reasonable costs of production include the “cost of the machinery and
appliances,” BoMar contends that the equipment it purchased is a necessary and reasonable
cost of production.  Burnham, 147 S.W. at 334.  Loyd, however, contends
that the purchase of the well constitutes a pre-drilling cost for which he is
not responsible.  

Burnham does not address the distinction
between original drilling and reworking.  The Texas Administrative Code defines
“drilling” as “activities designed and
conducted in an effort to obtain initial production from a well.”  31 Tex.
Admin. Code § 9.31(b)(2) (2009) (emphasis added).  “Reworking” constitutes “activities designed and conducted on a well in an effort to
restore or to enhance production in paying quantities from an existing well.”  Id. at § 9.31(b)(8) (emphasis added).  Thus,
in the context of re-working, “drilling” involves the actual efforts to restore
or enhance the well.  Purchase of the well head, casing, tubing, and line heater
is an event that occurs before the re-working phase begins.  Moreover, in Abraxas, the Austin Court noted that “one-time investment expenses, such as drilling and equipping costs,
are to be treated as capital expenditures” and are excluded from the definition
of “marketing and operating costs.” 
Abraxas, 20 S.W.3d at
756.

In fact, Kirsch testified that an
unleased mineral interest owner does not put up any money for the project or
agree to take any risks.  Preston testified that he and two investors each paid
$15,000 for the purchase of both wells.  Two other partners paid a total of
$11,000.  He and Kirsch both agreed that BoMar has recovered most of the
purchase price.  BoMar’s
purchase of the well equipment was a one-time investment
expense assumed by BoMar and excluded from the definition of “operating and
marketing expenses.”  See Abraxas, 20 S.W.3d at 756.  The evidence is legally and factually
sufficient to support a finding that purchase of equipment is an expense for
which an unleased mineral interest owner is not responsible.        

Pettit Zone Workover

BoMar spent several thousand dollars
testing the shallow Pettit zone before the deeper Cotton Valley zone.  Loyd testified
that the deepest zone should be tested first because shallower zones involve
substantially higher costs, given the need to also test deeper zones, and the risk
of losing the well bore.  Loyd explained in detail that testing shallow zones
complicates well bore mechanics because of the need to squeeze off the
shallower zone after testing.  Reviewing the well schematic, Loyd explained
that the Pettit had been tested in 1998 and found to be non-productive.  He explained
that the prior operator properly tested the deeper zone first because of the
minimal expense involved compared to the expense of squeezing off a shallow
zone.  According to Loyd, a conventional work-over would have cost about $5,000.
 He testified that $64,642 of the testing was unnecessary and unreasonable,
identifying the following expenses: (1) Pro Perforating, L.L.C. for $1,536;[6]
(2) Reliance Well Service, Inc. for $401 and $1,645; (3) Wireline, Inc. for
$1,091; and (4) G & G Equipment Co., Inc. for $3,712 and $816.  Because
BoMar had to drill out a bridge plug to get to Cotton Valley, Loyd did not
include this cost in his calculation.   

Ziegler confirmed that the Pettit was
tested in 1998 and found non-productive, but admitted that this testing was done
at slightly different depths than when tested by BoMar.  Ziegler further
testified that BoMar tested the Pettit out of sequence, meaning that operators
typically start at the bottom of a well and work up.  He testified that the
testing would not have been done had BoMar followed proper oilfield sequencing
and procedures.  Ziegler opined that doing so delayed both payout and payment
of revenues.  He further explained that BoMar purchased tubing around the time
of the testing.  Assuming the tubing was purchased for the Pettit, the entire
amount could be credited as unnecessary and unreasonable.  An invoice from
Trident Steel Corp. shows the cost of tubing as $12,873.  After reviewing invoices
and disregarding charges for work that needed to be done, Ziegler identified $33,328
in improper charges for the Pettit zone testing.  He too omitted the cost of
removing the bridge plug.  

Preston
testified that he had previously produced from a lower zone in the area, which
led him to test the Pettit to determine whether it could also produce.  He
admitted that the Pettit was previously tested and found non-productive, but that
BoMar tested at a lower depth.  Had he attempted Cotton Valley first, BoMar would
not have tried to perforate the Pettit at all, but would have had to squeeze
off the Pettit because of open perforations from prior testing.

Kirsch agreed that operators normally
test the deepest zone first and admitted that beginning in the shallowest zone is
unusual, but not unheard of.  He testified that BoMar’s testing followed industry
practice.  He also testified that the testing was reasonable, although at his
deposition he stated that the techniques used were reasonable, making no
determination as to the reasonableness of the actual testing.

BoMar contends that Loyd’s testimony is conclusory
on the issue of the Pettit testing.  However, Loyd explained why the testing
was unreasonable and unnecessary, taking into account proper expenses involving
work that had to be completed even without testing the Pettit first.  See Beaumont, 205 S.W.3d at 621.  Moreover, BoMar is
not entitled to recoup “expenditures
[that] did not actually extend the leasehold estate,” such as unsuccessful reworking
operations.  Shaw, 299 S.W.2d at 314; see Neeley v.
Intercity Mgmt. Corp., 732 S.W.2d 644, 647 (Tex. App.—Corpus Christi 1987, no
pet.) (“Appellees were not
entitled to recover for speculative efforts to preserve the common estate, if
unsuccessful.”); see
also Willson v. Superior Oil Co., 274 S.W.2d 947, 950 (Tex. Civ.
App.—Texarkana 1954, writ ref’d n.r.e.) (“[I]f
a co-tenant drills a dry hole, he does so at his own risk and without right to
reimbursement from his co-tenant
(in the absence of an agreement therefor) for the drilling costs.”).  The
evidence is legally and factually sufficient to support a finding that this
unleased mineral interest owner is not responsible for the costs of
unsuccessful testing.

Hydraulic Fracture Treatment in the Cotton Valley Zone 

According to BoMar’s final statement for
the Dodge and a handwritten invoice to working interest owners, BoMar spent
approximately $91,967 on a hydraulic fracture treatment performed in Cotton Valley.

Loyd opined that BoMar prematurely
conducted the fracture stimulation.  He explained that the fracture
insignificantly increased production from 100 MCF per day to 110 MCF per day. 
He admitted that the flow rate had continued to increase, but testified that
this would have occurred with natural clean-up of the well had BoMar allowed
the well time to clean-up and increase in flow on its own.  Loyd testified that
the fracture neither increased the reserves, as the same amount of hydrocarbons
would ultimately be recovered, nor accelerated the pay-out date.  Loyd testified
that $82,656 of the cost is unreasonable and unnecessary.

Ziegler testified that a portion of the fracture
costs were unreasonable and unnecessary.  The well was swabbed several days in
a row, the last two of which Ziegler opined were unnecessary because, other
than a few barrels of liquid, all the fluid had come out of the well.  Also, BoMar
purchased new tubing to complete the string of existing tubing to reach the
bottom of the well, but Ziegler testified that used tubing could have been
purchased at less expense.  Ziegler further testified that the fracture was too
large and too costly because BoMar perforated the well with 30 holes and used 120,000
pounds of sand total, when 2,000 pounds of sand per hole is appropriate.  Ziegler
further opined that BoMar could have obtained a larger discount than that
received from Schlumberger, the company performing the treatment.  Whether the
job was too large or BoMar could have obtained an additional fifteen percent
discount, $25,200 could have been saved.  Ziegler opined that $35,087 of the
fracture charges were unnecessary and unreasonable.  Alternatively, Ziegler testified
that the entire fracture treatment could be deemed unreasonable and
unnecessary.  He admitted that wells in the area are often fractured, but
explained that the fracture treatment failed to create much of an increase in
the flow rate.  Thus, Loyd would be entitled to $25,000 in reimbursement.

Kirsch testified that he is familiar
with the practice of completing wells in Cotton Valley and that he has never
seen a well completed in Cotton Valley without a fracture.  He explained that existing
tubing and casing can be used if it can withstand the pressure.  According to
Kirsch, some cement plugs and a cast iron bridge plug had to be drilled out to
get to the Cotton Valley.  Preston testified that he had fractured other wells
in the area.  He explained that the tubing would have to withstand high
pressures and he wanted “tubular integrity.”  He explained that after about six
months, the flow had increased to more than 250 MCF per day.

            BoMar contends that Loyd’s testimony is
conclusory.  We disagree.  Loyd explained that the fracture was performed
prematurely because the flow rate could have increased on its own without
incurring the added expense of a fracture and that the fracture was unnecessary
because it failed to increase the flow rate.  Even without his testimony,
Ziegler’s testimony supports these conclusions.  The jury was entitled to
accept Loyd’s position that the fracture was unreasonable and unnecessary and
reject BoMar’s contrary position.  See City of Keller, 168 S.W.3d at 819;
see also Golden Eagle Archery, Inc. v.
Jackson, 116
S.W.3d 757, 761 (Tex. 2003); Hinkle v. Hinkle, 223 S.W.3d 773, 778 (Tex. App.—Dallas
2007, no pet.).  The evidence is legally and factually sufficient to
support a finding that the hydraulic fracture treatment was an unnecessary and
unreasonable expense for which an unleased mineral interest owner is not
responsible.

Damages 

Having found that the above expenses are
unreasonable and unnecessary, we must now determine whether the evidence supports
an award of $72,162 in damages for these expenses.  To be sufficient, the testimony
“must be based on objective facts, figures, or data from which the amount of
lost profits may be ascertained” with “reasonable certainty.”  Szczepanik v. First S. Trust Co., 883 S.W.2d 648, 649 (Tex. 1994); Paradigm
Oil, Inc. v. Retamco Operating, Inc., 242 S.W.3d 67, 74 (Tex.
App.—San Antonio 2007, pet. denied).  Otherwise, it is speculative and conclusory and will not support a
judgment.  Paradigm Oil, 242 S.W.3d at 74.

We first note that there are several
expenses to which Loyd and/or Ziegler testified that BoMar does not challenge:
(1) $200 for a drilling permit; (2) $30 for an investor lunch; (3) $7,138 for
landman fees; (4) $2,615 for various work done by B.D. Dotson; and (5) $36,250
for attorney’s fees.  These amounts are also supported by documentary
evidence.  Loyd possesses a .3055555 interest, bringing his proportionate share
of these expenses to $14,127.  

Of the disputed expenses, the record
demonstrates that Loyd’s share of the purchase price is $6,875 and $367 for
engineering.  These amounts are based on the purchase and engineering costs
identified in BoMar’s transaction report.  As for overhead, the jury could
accept either Loyd’s testimony supporting $917 in reimbursement for five months
of overhead or Ziegler’s testimony supporting $14,299 in reimbursement for six
and a half years of overhead.  Ziegler’s testimony brings the balance to
$35,668.

As for the supervision fees, Loyd testified
to $5,347 in reimbursement for twenty-five days of supervision fees.  This amount
is based on the $17,500 identified in BoMar’s transaction report.  Ziegler
testified that Loyd is entitled to $7,714 in reimbursement for supervision
fees, but did not explain how he reached this number and the record does not so
indicate.  Taking the $5,347 identified by Loyd increases the balance to
$41,015.  

Loyd further testified that $64,642 of
the Pettit testing was unnecessary and unreasonable, but identified a mere
$9,201 in specific expenses.  Ziegler, however, identified $33,328 in improper
charges, entitling Loyd to $10,183.  BoMar does not challenge his testimony. 
Ziegler’s testimony brings the balance to $51,198.

Finally, Loyd testified that $82,656 of
the fracture treatment was unnecessary and unreasonable.  Again, he failed to
explain how he formulated this number.  Yet, BoMar does not challenge Ziegler’s
testimony identifying $35,087 in unreasonable and unnecessary costs.  This amount
entitles Loyd to $10,721.  However, Ziegler also testified that Loyd would be
entitled to $25,000 were the fracture deemed unnecessary and unreasonable.  Because
the testimony is sufficient to allow the jury to conclude that the entire cost
of the fracture was unnecessary and unreasonable, Loyd’s share of this cost brings
the balance to $76,198.  The jury’s award is, therefore, supported by the
evidence.  We overrule issue one.     

ATTORNEYS FEES

            In issue eleven, BoMar
contends that Loyd is not entitled to attorney’s fees.  

“[A] prevailing party cannot recover attorney’s fees from
an opposing party unless permitted by statute or a contract between the parties.”  Holland v. Wal-Mart Stores, Inc., 1 S.W.3d 91, 95 (Tex. 1999).
 There is no contract between BoMar and Loyd.  Because Loyd is not a consumer
under the DTPA, he cannot recover attorney’s fees under that statute.  See Parkway Co. v. Woodruff, 901 S.W.2d 434, 441 (Tex. 1995) (“In the absence of recovery under the DTPA, there is no
basis for the recovery of attorney’s
fees in this case.”).  Loyd alleged no other statutory claim
that would entitle him to attorney’s fees.[7] 
We sustain issue eleven.




EXEMPLARY DAMAGES

            In issue twelve, BoMar contends that
Loyd is not entitled to statutory or exemplary damages.  The jury awarded
$100,000 in exemplary damages for fraud and $200,000 for DTPA.  Because Loyd’s
DTPA and fraud claims are unsupported by the evidence, he is not entitled to
exemplary damages.  See Twin City Fire Ins. Co. v. Davis, 904 S.W.2d 663, 665 (Tex. 1995) (“[R]ecovery of punitive damages
requires a finding of an independent tort with accompanying actual damages.”).  We sustain issue twelve.  

INTEREST

            In issue thirteen, BoMar
argues that Loyd is not entitled to prejudgment interest.

            “[A] prevailing plaintiff may recover prejudgment interest
on damages that have accrued by the time of the judgment.”  Matthews v. DeSoto, 721 S.W.2d 286, 287 (Tex. 1986).
 There are two legal sources for an award of prejudgment interest: (1)
general principles of equity; and (2) an enabling statute.  Johnson & Higgins of Tex.,
Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507, 528 (Tex. 1998).  Loyd contends
that he is entitled to prejudgment interest as the prevailing party recovering
a money judgment.  Citing Concord
Oil Co. v. Pennzoil Exploration & Prod. Co., 966 S.W.2d 451 (Tex. 1998), BoMar contends that equitable prejudgment
interest cannot be awarded when the Natural Resources Code applies.

Section 91.402 of the Natural Resources
Code provides that oil and gas payments may be withheld without interest beyond
the time limits prescribed in section 91.402(a) if there is a dispute
concerning title that would affect distribution of payments.  Tex. Nat. Res.
Code Ann. § 91.402(b)(1) (Vernon Supp. 2008).  If payments are
withheld or suspended in accordance with section 91.402(b), the Payor is not
required to pay interest on the late payments.  Tex. Nat. Res. Code Ann. § 91.403(b) (Vernon 2001).  In Concord Oil, the Texas Supreme
Court stated, “The Legislature has indicated very clearly in the Natural
Resources Code that prejudgment interest is not due when disputes exist between
a ‘payor’ and a ‘payee’ over oil and gas titles.”  Concord Oil, 966 S.W.2d at 463.  Thus, “an award of equitable prejudgment interest would be
directly at odds with [section 91.402].”  Id. at 462; see Gore Oil Co. v. Roosth, 158 S.W.3d 596, 602 (Tex.
App.—Eastland 2005, no pet.) (“A
title dispute clearly existed in this case, and prejudgment interest was not
authorized.”).  

Before suit was filed, BoMar and Loyd
disagreed about the amount of Loyd’s interest, Loyd claiming that he had a .401873
interest rather than a .3055555 interest.  As a result, BoMar suspended
payments.  After suit was filed, Loyd stipulated to an amount of interest in
order to receive payments from BoMar and admitted at trial that his interest is
.3055555, as BoMar had originally suggested.  At a hearing on Loyd’s motion to
enter judgment, Loyd’s counsel informed the trial court that Loyd did not
allege a claim under the Natural Resources Code. 

It is apparent that section 91.402 applies
in this case, given the dispute over title.  Loyd was not entitled to interest
either equitably or statutorily.  See Concord
Oil, 966 S.W.2d at 463;
see also Gore Oil, 158 S.W.3d at 602.  We sustain issue thirteen.    

Conclusion

Having found that Loyd cannot prevail on
his claims for DTPA violations, fraud, and prejudgment interest, we modify the
judgment to delete the awards of $61,823 in attorney’s fees, $200,000 in exemplary
damages for the DTPA claim, $100,000 in exemplary damages for the fraud claim,
and $19,779.36 in prejudgment interest.  We further modify the judgment to
reduce the award of $73,162 in actual damages to $72,162.  The judgment is
affirmed as modified.

 

 

FELIPE REYNA

Justice

Before Chief
Justice Gray,

Justice
Reyna, and

Justice
Davis

(Chief
Justice Gray concurring and dissenting with note)*

Affirmed as
modified

Opinion
delivered and filed July 15, 2009

[CV06]

 

*           (Chief
Justice Gray does not join the Court’s opinion.  A separate opinion will not
issue.  He notes that notwithstanding the discussion under the heading
“INTEREST” in the Court’s opinion, it is clear from the remainder of the
opinion that this dispute was not about title.  This dispute was about what
expenses could properly be charged against an unleased mineral owner’s share of
production.  There has not been a dispute about title since September 13,
2004.  Therefore, because Section 91.402 of the Natural Resources Code is not
applicable to the dispute since that date, it does not give BoMar a right to
not pay what BoMar agreed it owed Loyd and because BoMar paid nothing to Loyd,
it now owes Loyd prejudgment interest.  There is absolutely no part or portion
of the trial court’s or this Court’s judgment that addresses or purports to
resolve a title dispute because that issue was taken out of the case by Loyd’s
stipulation.  Because the Court deprives Loyd of all prejudgment interest, I
respectfully dissent to that portion of the judgment and concur only in the
remainder of the judgment of the Court.)  

 

 









[1]               BoMar raised this issue
in a motion for directed verdict.  





[2]               Fraud by affirmative
misrepresentation arises where: (1) a material representation is made; (2) the representation
was false; (3)
the speaker knew it was false
or made it recklessly
without any knowledge of the truth and as a positive assertion; (4) the speaker
intended that the other party should act upon it; (5) the party relied on
the representation; and (6) the party thereby suffered injury.  Johnson v. Brewer &
Pritchard, P.C.,
73 S.W.3d 193, 211 n.45 (Tex. 2002).  Fraud by nondisclosure arises
where: (1) a party conceals or fails to disclose a material fact within the
knowledge of that party; (2) the party knows that the other party is ignorant
of the fact and does not have an equal opportunity to discover the truth; (3)
the party intends to induce the other party to take some action by concealing
or failing to disclose the fact; and (4) the other party suffers injury as a
result of acting without knowledge of the undisclosed fact.  Bradford v. Vento,
48 S.W.3d 749, 754-55 (Tex. 2001).  Reliance is an element of both.  See
Schlumberger Tech. Corp. v. Swanson, 959 S.W.2d 171, 181 (Tex. 1997). 





[3]               The jury awarded $72,162
in damages for Loyd’s accounting claim, but also awarded $73,162 for fraud
and/or DTPA.  The jury charge does not indicate the specific claim on which the
award was based.  To avoid double recovery, the trial court awarded the
$73,162.  As previously discussed, Loyd’s DTPA and fraud claims fail; thus, he
cannot recover the $73,162 in damages.  





[4]               Loyd complains that BoMar
fails to carry its appellate burden by neglecting to point the Court to places
in the record showing conclusory or speculative testimony or explain what type
of testimony would constitute probative evidence.  However, BoMar cites to the
record when referring to Loyd’s and Ziegler’s testimony and contends that the
evidence is not supported by any basis or analysis.





[5]               BoMar also relies on Wagner & Brown,
Ltd. v. Sheppard,
52
Tex. Sup. Ct. J. 130, 2008 Tex.
LEXIS 1000 (Tex. Nov. 21, 2008), in
which the Texas Supreme Court evaluated whether Wagner & Brown properly
accounted to co-tenant Sheppard for both production and expenses on a unit
basis:

 

The record reflects
that these expenses were for landman fees, lease bonuses, recording fees, and
title opinion expenses, part or all of which related to tracts in the unit
other than Sheppard’s. Additionally, “overhead” expenses (including
administration, supervision, office services, and warehousing) were calculated
pursuant to a standard accounting agreement relating to the unit.  At trial,
Sheppard produced no evidence that any of these expenses were not reasonable
and necessary; to the contrary, she stipulated that many of them were.   

 

Wagner, 2008 Tex. LEXIS 1000, at *12-13.  We do not find Wagner persuasive.  Unlike Sheppard, Loyd presented evidence that overhead
fees are unreasonable and unnecessary and did not stipulate to the contrary.  Nor
does the record indicate that overhead was calculated per any accounting agreement
to which Loyd is a party.  

 





[6]               Loyd testified to $1,836;
however, this excluded a $300 discount applied if the bill were paid within
thirty days.  The discount was apparently applied, as evidenced by BoMar’s
transaction report.





[7]               BoMar points out that
Loyd could recover attorney’s fees under the Natural Resources Code, but Loyd
did not bring such a claim.  See Tex. Nat. Res. Code Ann. § 91.402 (Vernon Supp. 2008)
(timely payment of oil and gas proceeds); see also Tex. Nat. Res. Code Ann. §
91.404 (Vernon 2001) (non-payment of oil and gas proceeds); Tex. Nat. Res. Code Ann. §
91.406 (Vernon 2001) (attorney’s fees).